287 So.2d 873

**John Powell RICH**

v.

**STATE.**

**6 Div. 475.**

Court of Criminal Appeals of Alabama.

Dec. 11, 1973.

Robert R. Bryan, Birmingham, for appellant.

William J. Baxley, Atty. Gen., Montgomery, and Jonathan Prince Gardberg, Sp. Asst. Atty. Gen., Mobile, for the State.

HARRIS, Judge.

Appellant was convicted of murder in the second degree and his punishment fixed at imprisonment in the penitentiary for a term of sixty (60) years. The homicide occurred on May 11, 1968. He was indicted for murder in the first degree on June 7, 1968. At arraignment on August 6, 1971, attended by counsel of his choice, he pleaded not guilty and not guilty by reason of insanity. He was tried on the 26th day of September, 1972. He retained new counsel to prosecute this appeal.

The time lag between arraignment and trial was due to appellant's incarceration in Bryce Hospital by order of Judge Wallace Gibson rendered on September 24, 1968. The order, in pertinent part, stated:

"* * * it appears to the court that he may be insane and this court has initiated an investigation of defendant's mental condition, and has called Dr. J. P. Hodges, a respectable physician, and several wardens (jail) where he is confined, and from the testimony of said witnesses, it has been satisfactorily proved that the defendant may be of unsound mind and needs further examination by trained physicians in the field of psychiatry for the purpose of determining whether he is in fact of sound or unsound mind."

The facts surrounding the killing are not in dispute. In the early morning hours on May 11, 1968, appellant bludgeoned his aunt, Margaret Powell, with a crowbar. Shortly thereafter she died in the operating room of a local hospital. On autopsy it was determined that she sustained a fractured skull. Death resulted from trauma to her head.

Appellant and Miss Powell lived in a three-bedroom house. Miss Powell occupied the front bedroom, a roomer, Barney Harmon, occupied the second bedroom and appellant the third.

Barney Harmon came to the house around 1:30 to 2:00 A.M. He did not have a key and in response to his knock Miss Powell came to the front door and let him in. He went directly to his room and undressed. He got into bed and turned on a small transistor radio and, while smoking in bed, listened to country and western music. About an hour later someone knocked on his door. He did not answer, pretending to be asleep. A few minutes later he heard Miss Powell say, "Go on to bed and let me alone." Then he heard Miss Powell suggest they go to the kitchen and make coffee. Shortly thereafter, Harmon heard them leave the kitchen and go into the room occupied by appellant. A few minutes later he heard a number of "banging type noises" and it seemed to him that someone fell against his bedroom door. Ten or fifteen minutes later appellant called him and asked for help to get out of his room, stating he could not find his key. Harmon got out of bed, dressed and combed his hair. He went to the back porch and got a skeleton key from the back screen door and unlocked appellant's bedroom door. He opened the door about half way and saw appellant standing up. He had on undershorts and a t-shirt. He saw Miss Powell slumped on the floor against the connecting door of his and appellant's bedroom and saw blood on the door and all over the place. He became frightened and told appellant the boys were here to play poker and that he was going to pick up some beer and left the house. Harmon went to a launderette and called the police department. He did not return to the house for a couple of days. At seven o'clock that morning he went to police headquarters and gave a statement as to what had transpired.

Harmon testified that he observed appellant briefly before he left the house; that appellant's eyes were glassy looking, like he had been drinking; that he weaved and staggered when he walked, and that he smelled the odor of alcohol in the room. He did not get close enough to appellant to smell his breath. He said no one else was in the house at the time; that he told appellant about the boys being there to play poker and that he was going to get some beer using this as an excuse to get away from the house.

Appellant had a long history of mental disorders dating back to 1948. During the span of years from 1948 to the date of the killing, he was admitted to Bryce Hospital six times. Upon the first admission, and several successive ones, the diagnosis was schizophrenic reaction, schizo-affective type. On the last two admissions—November 18, 1966 to February 14, 1967 (3 months) and from September 25, 1968 to June 17, 1971 (44 months)—the diagnosis was schizophrenia, paranoid type.

During remissions he married twice. A daughter was born to the first marriage. Apparently neither wife knew about his mental illness. Both marriages ended with divorces.

During the last admission to Bryce he was put on various medications and a program of close supervision and examinations. At times he was in isolation. When on the wards he worked at different jobs. He declined to clean floors as this type work was beneath his dignity. He preferred to work in the canteen as this job required a degree of responsibility more in keeping with his previous employment in an A.B.C. Store. He gained weight and steadfastly improved in his mental outlook. He became oriented as to time and place and often voiced his desire to return to Birmingham and face the charges pending against him.

Appellant was brought before the medical staff at Bryce Hospital on June 17, 1971. During this interview he was interrogated at length as to the charge pending against him. The interview went like this:

"*Dr. Thompson:*

"Q. Come in Mr. Rich and have a seat.

"A. Yes, sir.

"Q. I'm Dr. Thompson—

"A. Yes, sir, I remember you was at the board meeting the other time, when I first came in.

"Q. When you first came in?

"A. Uh, huh.

"Q. You have been here many times, have you not?

"A. Yes, sir, sure have.

"Q. I believe this last time you had charges. Your aunt died or something.

"A. Yes, sir.

"Q. Could you tell us about that?

"A. Well, I have a murder charge against me up there in Jefferson County.

"Q. Why would they charge you with it?

"A. Well, I was the only one living in the house with her.

"Q. Do you know anything about it?

"A. Yes, I do.

"Q. How did it come about?

"A. Well, I think I was the one that killed her because, you see, I saw a form moving around there in the room late at night, and I picked up something and struck it. After I turned the light on I saw it was her.

"Q. I see.

"A. It was an accident, a pure accident, accidental case. I would like to go back to court and face this charge, see. Perhaps I can get out on probation or if I do get any time I will know how long I'll have to serve.

"Q. Do you take any tranquilizers now?

"A. Yes, sir.

"Q. What are you taking?

"A. Mellaril I think.

"Q. How does this affect you?

"A. It keeps me quiet and helps me to sleep at night.

"Q. How about your thinking?

"A. It helps me to think clearly.

"Q. You have been in here since I saw you last?

"A. No, sir, I haven't been back.

"Q. What?

"A. I haven't been out since you saw me last.

"Q. You are down at Zodiac Hall?

"A. Yes, sir, uh, huh.

"Q. How long have you been working down there?

"A. About four or five months. I like it real well down there too. It gives me a chance to kindly help the fellow patients.

"Q. How about hearing voices?

"A. No, I don't hear any voices.

"Q. Do you have any unusual ideas?

"A. No, sir.

"Q. Did you before you came in?

"A. No, sir, uh, uh.

"Q. How about medication when you go out of the hospital, will you continue taking it?

"A. Yes, sir, if it's necessary I will continue taking it.

"Q. Are there any other questions?

*"Dr. Monroe:*

"Q. What are your charges, Mr. Rich?

"A. Murder charge.

"Q. Of whom?

"A. My aunt.

"Q. Do you remember much about it?

"A. I remember some of it.

"Q. What happened that you remember?

"A. Well, like I say, I was asleep that night and I woke up and saw a figure moving around in my bedroom and my first thought was that a burglar had come in there. So I just picked up the first thing that was handy and struck it in the head. Then I found out later that it was my aunt.

"Q. Did you live in the home with your aunt?

"A. Yes, sir.

"Q. Had you had any trouble with her previously?

"A. No, sir.

"Q. What did you use, by the way?

"A. Crowbar I reckon.

"Q. What was that doing inside your house?

"A. I had been doing some work around the house, doing some repair on the window sills and such as that.

"Q. Had you been drinking that night?

"A. I drank a little, yes, sir.

"Q. There was a big write up in the paper about it, was it not?

"A. No, not that I know of.

"Q. Do you think you are will (sic) enough to go back—

"A. Yes, sir, I think so. I certainly do —

"Q. Do you think you are able to participate in your defense? You know you have these charges against you?

"A. Yes, sir, I know that, but I would like to go back and face them.

"Q. Suppose they send you to prison though?

"A. Well, if I have to do it, a certain length of time—I feel that someday I'll get out. So I might as well go ahead and serve it and get it over with.

*"Dr. Thompson:*

"Q. How old were you when you first came down here?

"A. About eighteen.

"Q. And you were 39 when you came in this time, are you 42 now?

"A. Yes, sir.

"Q. Let's see 18 from 42 is about 24 years, how much of that time have you spent here?

"A. Well, altogether you mean?

"Q. Yes?

"A. I would say about four of (sic) five years.

"Q. I see.

*"Dr. Monroe:*

"Q. This is your seventh admission here, did you know that?

"A. Yes, sir.

*"Dr. Thompson:*

"Q. Previous to this, have you ever had charges at other times?

"A. No, sir.

"Q. This is the only time you have had charges?

"A. Yes, sir.

"Q. Do you remember when you came in this time talking to me?

"A. Yes, sir.

"Q. Do you remember telling me that your aunt was still alive?

"A. I couldn't realize it at the time the full extent of what I had done.

"Q. Did you sort of play like she was alive? Couldn't admit it to yourself?

"A. I finally admitted it to myself. She has been such a good friend of mine over the years and done so much for me that it was just hard for me to realize that she was dead.

"Q. At the time that happened, had you been pretty suspicious of anybody spying on you or trying to break in your house or anything?

"A. No, sir.

"Q. Are there any other questions? All right, thanks for coming in.

"A. Thank you."

Following the above interview, his case and condition were discussed and diagnosed as follows:

Diagnosis: Schizophrenia, Paranoid Type. In Remission.
Disposition: Return to court.

The following letter was sent to Judge Gibson:

"STATE OF ALABAMA
DEPARTMENT OF MENTAL HEALTH
BRYCE HOSPITAL
TUSCALOOSA, ALABAMA   35401

"(seal)                                          •        (seal)
STONEWALL B. STICKNEY, M.D.        GEORGE C. WALLACE
COMMISSIONER OF MENTAL HEALTH   GOVERNOR

"JUNE 21, 1971

"Honorable Wallace Gibson
Judge of Circuit Court
Jefferson County, Alabama
Birmingham, Alabama

"Rich, John Powell
Our File 00 76 84

"Dear Judge Gibson:

"John Powell Rich was admitted in Bryce Hospital on September 26, 1968, on your order dated September 24, 1968, and is presently a patient in Bryce Hospital.

"After a period of examination, observation, and study, it is the opinion of the hospital staff that the said John Powell Rich is presently sane and competent.

"We are ready to release him and will hold him awaiting the arrival of the sheriff, or any duly appointed officer, to take him into custody.

"Sincerely,

"Donald Smith
Donald Smith, M.D.
Superintendent

"DS/pk

"cc: Mr. M. L. Wood
      Transfer Agent
      Probate Office
      Birmingham, Alabama"

This letter put appellant to trial.

By stipulation all of appellant's medical records from Bryce Hospital were admitted into evidence.

Dr. William D. King, a private practitioner in Birmingham and a specialist in Internal Medicine, Cardiology, and Analytical Psychiatry, testified on behalf of appellant. Dr. King did not personally know appellant and had never seen or interviewed him. His testimony was based solely upon an examination and study of appellant's medical records from Bryce Hospital. The trial court ruled that he was qualified to express an opinion as to appellant's mental condition at the time of the killing. Of necessity, Dr. King's opinion had to be based upon a hypothetical question.

From the record:

"THE COURT: Before you start, Mr. Wheeler—ladies and gentlemen, Mr. Wheeler is proposing to ask Dr. King what we call a hypothetical question. Under the law before a hypothetical question can be put to a doctor, it must be based upon facts that are in evidence or that there must be a tendency of the evidence to establish the facts that are the basis of the hypothetical question. A hypothetical question is a supposition type question. Suppose certain facts to exist. Then a question comes on a basis of the supposition. The matters and things that are contained in the supposition, that is to say the hypothetical aspect of this case, the court is informed by Mr. Wheeler as an officer of the court, that he has studied the records concerning this defendant at Bryce's Hospital and that all the matters and things that are contained in this hypothetical question are lifted from, taken from the record, at Bryce Hospital. Now, normally before a hypothetical question will be permitted to be asked there would be evidence adduced before a jury concerning all the matters and things that go to make up the hypothetical question. By agreement with the State, the State is agreeing that such questions be asked without objection. It is based upon the testimony that, not testimony, by the evidence that has been offered here in this group of papers here which are the records from Bryce Hospital which you will have with you in connection with this case. They are in evidence. All right Mr. Wheeler.

"Q. Now doctor, assuming that John Powell Rich is a man now 43 years of age. He is sitting on my right; that his mother and father were separated when he was very young; that he never knew his father; that he lived and was raised with his mother and (her) two sisters and had no brothers and sisters, assuming further that on or about March 21, 1948, he was convicted of Grand Larceny in Jefferson County and sentenced to 4 years and 4 days and went to the penitentiary for stealing typewriters. On April 15, 1948 at which time he was 19 years of age, he was transferred by order of the Governor of the State of Alabama, James Folsom, to be removed from the State Penitentiary to Bryce Hospital. His history at Bryce Hospital on his first admission showed that he jumped up and down on the bed so that they had to put the mattress on the floor, talked wildly, was much elated, over active, talkative, confused, alert, witty, cooperative, pleasant and noisy. He was given electroshock treatments. He was discharged August 4th 1949. The diagnosis of Psychopathic Personality with Psychosis.

"THE COURT: I'll ask you to slow down just a little bit.

"MR. WHEELER: Yes, sir. Doctor Tarwater was the superintendent and this diagnosis was made by Dr. Tarwater and his staff of doctors. While on this admission to Bryce Hospital he had headaches. The second time he was committed to Bryce Hospital was on January 11, 1954. In the meantime he had married and separated from his wife. The history at Bryce Hospital states that he told a vague disconnected story about going to Detroit where he worked for four months, came back to Bir-

mingham, went into a tirade about his aunt, stating that Aunt Margaret is fine but Aunt Mary is a louse. He was furloughed to his aunt, Miss Powell on May 14, 1954, he was diagnosed by the staff as having a manic episode, now recovered. Assuming that he was admitted the third time on August 5, 1958, having been committed by the Probate Court of Jefferson County Alabama, where a diagnosis of schizophrenic reaction, schizo-affective type was made. He was given prescriptions for Thorazine. While at Bryce on this admission, he was given shock treatments. Before coming to Bryce Hospital he was committed to the Hillcrest Sanitarium in Birmingham for a week, where he claimed he was mistreated. He was furloughed from Bryce on September 26, 1958. Assuming further that John Powell Rich was admitted to Bryce the fourth time on April 7, 1961 by the Probate Court of the County, where the staff made a diagnosis of schizophrenic reaction schizo-affective type. While at Bryce he talked in a disconnected fashion and was furloughed to his aunt August 28, 1961. During this interview on this admission he stated that he had had ten years of college and was hostile and confused. Assuming that he was committed the fifth time to Bryce by the Probate Court of Jefferson County on September 4, 1963 where the same diagnosis was made of schizophrenic reaction, the history of the hospital on this man stated in this admission that he was out of touch with reality. He rambled, was loud with grandiose ideas and on this interview stated that he spent the summer of 1963 at Western State Hospital, Marion, Virginia and was sent from that institution to Bryce Hospital. The application referring to the patient as having disorganization of thinking, ideas of having college degrees and winning Nobel Prizes. He was furloughed August 25th 1963 with the same diagnosis as before.

"Assuming further that in the meantime he had married for the second time on July 15, 1957 and could not get along and a divorce was granted in February 1960.

"Assuming that his work record showed that he worked 'for W. W. Grainger from March 1950 to 1951, about a year, at Rex Vacuum Company for about a year, at Fixture Display Company where he quit after a short time, worked in Detroit in the summer of 63 until Christmas, said it was too cold, so he quit. Thereafter he worked for Okonite Cable and Iron Company and was laid off after a short time.

"Assuming further that he was admitted for the sixth time to Bryce Hospital on November 18, 1966 to February 14, 1967 with the same diagnosis of schizophrenic reaction, on this admission the history showed that in December 1966 he and his aunt bought a small delicatessen and he stated that they had only bad luck, that an employee had stolen 1,500 dollars worth of groceries and 800 dollars in cash; that on this admission he was overactive and during the interview started to pick up the desk. Said he had played football for Georgia Tech, showed marked flights of ideas, could not concentrate on any subject for any length of time.

"Assuming further that on the seventh and last admission to Bryce Hospital he was committed by the Honorable Wallace Gibson of the Circuit Court of Jefferson County to be kept in custody pending sanity hearing; that on September 26, 1968 he was charged with killing his aunt, Miss Margaret Powell.

"That on his admission to Bryce, he requested the social worker to get in touch with his aunt, Miss Margaret Powell, since he had not heard from her since May and she was his only relative. On this admission he was diagnosed by the doctor and his staff as a schizophrenic paranoid type and this disposition was that he remain in the hospital.

"Assuming further that in an interview with the staff on November 7, 1968 he stated that he had an aunt living in Birmingham and when informed that his aunt was dead, he said that wasn't true as he saw her outside the jail in Birmingham,

stating that she was a nice person, that he had never struck her and that his aunt needed him.

"Assuming further that in an interview with the staff doctors on June 17, 1971 the subject stated to the doctors at the staff meeting that he thought he was the one that killed her, said 'I saw a form moving around the room late at night and I picked up something and struck it. After I turned the light on I saw it was her' he further stated during this interview 'like I say, I was asleep that night and I woke up and saw a figure moving around in my bedroom and my first thought was that a burglar had come in, so I just picked up the first thing that I could find and struck it in the head and found out later that it was my aunt.' He further stated that he has not had any trouble with his aunt and believes what he had hit her with was a crow bar, which he had used to make some repairs on the window sill and such as that. He further states that he wanted to go back and face these charges.

"Assuming further that the staff at that time made a diagnosis of schizophrenic paranoid type in remission, the written comments of Doctor Thompson on that occasion being 'I do not think he was competent at the time he got those charges'.

"Assuming further that the comments of Doctor Monroe were: 'I agree that Mr. Rich was very psychotic when he came in. He was delusional, over-talkative, hyper-manic—maniac and he did not know right from wrong.'

"Assuming further that the testimony in this case was that a roomer, Barney F. Harmon, heard a noise in his room and heard the defendant asking him to help find the key to his room and when he got around to opening the door and looked in, the defendant was standing in the room in his shorts with nothing in his hands and his aunt was lying against the wall with blood over her. And his statement was, when the roomer asked him what was happening, 'where is everybody at.'

"Now, doctor given these facts as assumed in this question and assuming that this crime was committed by this man, I will ask you whether, in your opinion, he was insane in the sense either he did not know right from wrong or knowing right from wrong, he was unable to refrain from doing the wrong? That is the legal definition of insanity in Alabama. Under that definition and the facts assumed in this hypothetical question, in your opinion, was he on that occasion sane or insane?

"A. On a review of the records from the Bryce Hospital all of the admissions of the hospital, although they describe his behavior some difference and variances to degrees of mania or degree of paranoia, they all concur on his admissions on each of these occasions the man was psychotic. The social worker's notes on her interview gives some lead to the duration of the psychosis on some admissions.

"MR. HARD: Your Honor, I believe the witness is varying.

"THE COURT: Are you objecting?

"MR. HARD: Yes, sir.

"THE COURT: I sustain. You have a question put to you.

"A. I can't answer it as a straight yes or no, Judge. I have to condition it.

"MR. WHEELER: Judge, I think if I may state that the doctor to answer the question has to go into it a little bit and I would like to ask the Court's indulgence to let him answer it.

"THE COURT: The hypothetical question embodying as much as it does of these records, the question that goes to him is of a very direct nature. I think it is subject to an answer, a direct answer. So I sustain the objection. You may answer the question that is put to you. I'm not trying to preclude you from having a further— from making some further statement but the question—you have a question put to you now in this hypothetical question and I think it is subject to your answering that

question at this time. There may be other things that you can testify to.

"MR. WHEELER: I'll bring those out, doctor and—

"A. Your, Honor, for my own clarification—

"THE COURT: All right.

"A. My answer if it has to be a direct one is as hypothetical as the question that was given to me.

"THE COURT: Well, I'm going to let you people go back to the jury room back there, if you will.

"(Thereupon, the jury left the courtroom and went into the jury room at 3:25 p. m., when, out of the presence and hearing of the jury, the following proceedings were had and done:)

"THE COURT: This question, doctor, has embraced within it a brief summary of what the law is in Alabama concerning insanity. Do you understand that part of the question toward the end of it?

"A. Yes, sir, I understand, whether a man is sane or insane.

"THE COURT: Do you understand that he is asking you for an opinion as to whether or not this man was at that time sane or insane? Do you understand that?

"A. Yes, sir.

"THE COURT: All right, do you have an opinion as to whether or not he was sane or insane at that time?

"A. As an opinion only?

"THE COURT: Yes, sir, what is your opinion?

"A. That he was insane at that time.

"THE COURT: All right, that's the proper procedure so far as this situation is concerned. I'm not undertaking to limit what you say. But the question that you have before you is whether or not you have an opinion with respect to this and what is the opinion. That's where you are.

"MR. WHEELER: All right.

"THE COURT: That's the point you are objecting to, Mr. Hard?

"MR. HARD: Yes, sir.

"MR. WHEELER: Then I can bring out the other—

"MR. HARD: Judge may I ask the doctor a question on voir dire.

"THE COURT: Yes, sir.

"VOIR DIRE EXAMINATION

"Q. (BY MR. HARD:) Is your opinion based solely on the question as asked you? Sir?

"A. On a review of the records from Bryce Hospital sir.

"Q. Solely on that review not on the social worker's notes or anything outside?

"A. The social worker's notes were included in the records that I reviewed.

"THE COURT: Well, this is a hypothetical question. This is not based upon the facts that are enumerated in this question. That's the basis of the question.

"MR. WHEELER: Just what was stated here.

"THE COURT: What has been read to you. That's the question for you to answer, not anything that is based upon anything else. I don't mean to limit you with respect to other testimony.

"A. I understand what you are saying. Only giving these two things (1) I have learned this amount of information and (2) I have gotten a question now what do I think of the consequences, what is my opinion of the consequences?

"THE COURT: The question—

"A. And the question is—

"THE COURT: Based upon this hypothetical question, whether or not you think

that the man was sane or insane at that time?

"A. All right, sir.

"THE COURT: You've got it in focus now?

"A. Right.

"THE COURT: Now do we all understand one another in this point?

"MR. WHEELER: Yes, sir, I think so, I'll ask—

"THE COURT: Your answering this question was based solely on the hypothetical question he has put to you?

"A. Yes, sir, that he gave me.

"THE COURT: All right bring the jury back. Do you move to strike the partial answer that was made?

"MR. HARD: Please, sir.

"(Thereupon, ensued an off the record discussion between all counsel and the Court following which at 3:29 p. m., the jury returned to the courtroom, following which the following proceedings were had and done:)

"THE COURT: Ladies and gentlemen I sustain the objection and I exclude from your consideration such answer as has been made by the doctor. Now what I mean by that, when I say that I exclude it from your consideration, it's not to be a part of your thinking with respect to determining the guilt or innocence of Mr. Rich. That is what excluding it from you means. All right, you may proceed.

"MR. WHEELER: That's just the last part?

"THE COURT: That part of the answer that the doctor has made in response to the question that was put to him.

"DIRECT EXAMINATION CONTINUED

"Q. (BY MR. WHEELER:) Doctor, you heard the hypothetical question that I had just read, given these facts as assumed in that question and assuming that this crime was committed by Mr. Rich here, I will now ask you whether, in your opinion, based on these facts, he was insane in the sense that either he didn't know right from wrong or knowing right from wrong, he was unable to refrain from doing wrong. That is the legal definition of insanity. Under that definition and the facts assumed in this hypothetical question, in your opinion, do you have an opinion, I will first ask you, as to whether he was sane or insane?

"THE COURT: At the time of the alleged commission of the act?

"MR. WHEELER: Yes, sir.

"A. It would be my opinion that—

"THE COURT: Do you have an opinion?

"A. That he was insane.

"THE COURT: Do you have an opinion?

"A. I have an opinion?

"THE COURT: What is the opinion?

"A. That he was insane."

*On cross-examination Dr. King was asked if he had an opinion as to appellant's sanity at the time of trial. He replied that he wasn't asked to determine that.* It was his opinion that appellant was insane on May 10, 1968—the day before the homicide —and was insane on the day of his admission to Bryce Hospital.

Dr. King was asked to explain the word "remission" and his answer was,

"A. When I say remission, I am making reference to the records, where the doctor in evaluating him to furlough him out of the hospital, declared him on two occasions, they declared him sane and referred him once back to Kilby Prison to serve his sentence and another time to the criminal courts for trial. Another time he was furloughed home as in re-

mission. Remissive periods can be interpreted as being in sane periods of time."

One of appellant's major claims of error on this appeal is that he was denied due process of law for failure of the trial court to conduct a hearing, prior to the trial in chief, *upon his competency to stand trial.* This question was not raised in the trial below but appellant contends that this should have been done *sua sponte.*

We are, thus, confronted with a grave question of constitutional due process in this case. The problem is most troublesome in the light of appellant's long history of mental disorders and repeated episodes of mental illness.

Two months ago we had occasion to deal with this same issue, Pierce v. State, Ala. App., —— So.2d —— (M.S.), September 28, 1973.

In *Pierce* we said:

"The most economical and expeditious procedure to establish competency to stand trial would consist of a pretrial motion seeking the application of Tit. 15, § 426, Code, supra. However, our interpretation of Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815, convinces us that appellant had a right to establish even during trial his incompetency to stand trial. Logically, it would appear that a party waives his right to object to being put to trial on ground of incompetency when he sits idly by and fails to seek a pretrial determination. We are, however, bound by the unequivocal compulsions enunciated in *Pate,* supra. In rejecting the waiver concept, the United States Supreme Court in *Pate* observed:

'[2, 3] The State insists that Robinson deliberately waived the defense of his competence to stand trial by failing to demand a sanity hearing as provided by Illinois law. But it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently "waive" his right to have the court determine his capacity to stand trial. See Taylor v. United States, 282 F.2d 16, 23 (C.A. 8th Cir. 1960). In any event, the records shows that counsel throughout the proceedings insisted that Robinson's present sanity was very much in issue. He made a point to elicit Mrs. Robinson's opinion of Robinson's "present sanity." And in his argument to the judge, he asserted that Robinson "should be found not guilty and presently insane on the basis of the testimony that we have heard." Moreover, the prosecutor himself suggested at trial that "we should have Dr. Haines' testimony as to his opinion whether this man is sane or insane." With this record we cannot say that Robinson waived the defense of incompetence to stand trial.' 86 S.Ct. at 841.

"The rationale of *Pate,* supra, is fundamentally irrational. We find a defective premise in the logic upon which the conclusion is reposed that an incompetent cannot waive rights. An indigent criminal defendant speaks not of his own volition but through a duly appointed effective counsel. *Pate* presents a costly and dilatory exception to the general rule that a client is bound by the acts and omissions of his effective counsel. It takes no great legal aptitude to foresee the abuses of judicial process possible under the *Pate* rule. For example, the defendant may remain mute through the entire trial proceedings and, if he feels his chances are slight, then raise incompetency to stand trial as a ground for suspension of the trial proceedings. If defendant feels his chances are good, he would fail to raise incompetency and hope for acquittal. This strategy is, of constitutional necessity, masterminded by effective counsel who surely must have the mental competency to effect a waiver. The competence of counsel should be vicariously imputed to the appellant; however, the supremacy clause of the

United States Constitution dictates that we follow *Pate,* supra, irrespective of our predisposition to find a valid waiver."

We have already pointed out that appellant is not indigent. He was represented in the court below by effective, energetic, resourceful and competent counsel. We have been favored in this appeal with briefs by counsel possessing the same attributes of professionalism and ingenuity.

The issue here is not whether appellant was insane at the time of the commission of the homicide as the verdict of guilty concludes that question adversely to him. Pierce v. State, supra, and cases there cited. The issue is his competency to stand trial, viz., his ability to know and understand the nature and the consequences of the charge against him, his awareness and appreciation of his surroundings, and his ability to aid and assist counsel in his defense. To put one to trial who is presently insane or who is incompetent to stand trial borders on barbarism, offends every tenet of a civilized society, and clashes head on with constitutional due process.

On balance we think this case is distinguishable from *Pierce,* supra, and Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L. Ed.2d 815. Here we have a letter from the Superintendent of Bryce Hospital certifying that "after a period of examination, observation, and study, it is the opinion of the hospital staff that the said John Powell Rich is presently sane and competent." Possessed with such a potent letter from the Superintendent of one of the most prestigious mental institutions in the land, can it be seriously contended that the trial judge was, nevertheless, compelled to the conclusion that he should have entertained a "bona fide doubt" or reasonable doubt as to the competency of appellant to stand trial? Some courts may so hold but speaking for ourselves, we do not think so. The responses appellant gave to the questions posed by the hospital staff during his last interview on June 17, 1971, show that

he spoke with clarity and had a full understanding of the charges against him. He was fully aware that he might be convicted of killing his aunt and would be sentenced to the penitentiary. He evinced the desire to face the charges against him, serve his sentence and get it over with. In the light of all the facts and circumstances of this case, as grave as they appear, we do not feel that the verdict is wrong and unjust and that it should be disturbed by us.

Appellant did not take the witness stand and this fact could well have been a decision involving trial strategy. The only utterance he made was at the beginning of the trial and that was in reference to permitting the jury to separate. The matter came up this way:

"THE COURT: Let the record show that we are in my chambers outside the hearing and presence of the jury. That the defendant is here, his counsel, Honorable Malcolm Wheeler, is here and Honorable Jim Hard, representing the State is here. The law provides that during the course of a trial, a jury does not have to be kept together, if the State, through its counsel, the defendant through his counsel, and the defendant himself in his own proper person agrees that a jury may be allowed to separate. This means that the jury will be permitted to go to their respective homes at night, be allowed to have their meals separate one from the other and have freedom of the halls as the case progresses. All of this under instructions from the Court with respect to their not discussing the case with anyone or allowing anyone to talk with them. What says the State with regard to the jury being allowed to separate?

"MR. HARD: The State agrees the jury may separate, your Honor.

"THE COURT: Mr. Wheeler?

"MR. WHEELER: The defendant's counsel agrees they be allowed to separate.

"THE COURT: Mr. Rich?

"THE DEFENDANT: I agree.

"THE COURT: The law enjoins me to ask you separate from your attorney, you say you agree?

"THE DEFENDANT: Yes, sir."

Appellant strenuously contends that he was denied his constitutional right to compulsory process to procure an expert witness for his trial. A subpoena was issued and served upon the Superintendent of Bryce Hospital who returned the subpoena to the court invoking the exemption in Title 45, Section 226, Code of Alabama 1940. Appellant's astute counsel is familiar with this law but claims that it is unconstitutional as being in contravention of the Fourteenth Amendment of the Constitution of the United States and Article I, Section 6, of the Alabama Constitution. This issue was not raised in the trial court. We will not undertake to pass on the constitutionality of Section 226. This section provides an acceptable alternative to the in-court presence of the Superintendent and the staff of Bryce Hospital by way of a pretrial deposition. Sheppard v. State, 49 Ala.App. 398, 272 So.2d 605; Pierce v. State, supra.

The testimony of state witness Harmon as to the odor of alcohol in the room where he found appellant and the prostrate body of Miss Powell coupled with appellant's appearance as being "glassy eyed", and his staggering and weaving when walking sufficiently justified the trial court in charging the jury on the law of intoxication. Aside from this, there was no exception reserved to this portion of the oral charge and the error complained of is not subject to review. Alabama Digest, Criminal Law,⊘1056.1(1).

We have found no error in the record and the judgment of the trial court is affirmed.

Affirmed.

ALMON, TYSON, and DeCARLO, JJ., concur.

CATES, P. J., concurs in result.