318 So.2d 813

**Billy Don CLARK**

**v.**

**STATE.**

**6 Div. 494.**

Court of Criminal Appeals of Alabama.

Nov. 12, 1974.

Rehearing Denied Dec. 17, 1974.

William M. Dawson, Jr., Birmingham, for appellant.

William J. Baxley, Atty. Gen., and Joseph G. L. Marston, III, Asst. Atty. Gen., for the State.

TYSON, Judge.

We now review this entire record as is our duty under the law.

State Toxicologist Robert B. Johnson testified that he examined the body of Donald Richard Gwin on September 15, 1969, at the Strickland-Hayes Funeral Home in Tuscaloosa at the request of the coroner, Mr. Rufus Strickland. His testimony as to the cause of death is as follows:

"In my opinion, the subject died from multiple gunshot wounds to the right side of the head, damaged the vital areas of the brain resulting in a fatal hemorrhage."

Mr. Johnson further testified that he recovered six .22 long rifle bullets from the body of the deceased.

Carl Birchfield testified that the deceased, Donald Richard Gwin, and the appellant came by his store at about 3:00 on the afternoon of Saturday, September 13, 1969, bought some groceries and cigarettes, and stated they were going to the home of the deceased.

Charles Kenneth Gilbert testified that he had gone by the home of the deceased with one Randall Shattuck shortly after 12:00 noon on Saturday, September 13, 1969, and that the appellant was at the home of the deceased. He stated he did not see the deceased alive again. On cross-examination, he testified that the two men had been drinking beer, that there were some bottles in the house.

Randall Shattuck testified that he was the half brother of the deceased, that he had gone by the home of the deceased on Saturday, September 13, 1969, on the first occasion, about 8:00 in the morning, that later he returned with a friend, Kenneth Gilbert, at about noontime, that they stayed approximately thirty minutes, and that the appellant told them on this occasion he had been picked up for hitchhiking in Mississippi and had to pay a fine. He stated that the deceased told him he had met the appellant near Birmingham at a service station after he had gotten off work on Friday, and that the two men had been drinking beer. He stated that the deceased

owned a 1967 Dodge Dart Convertible. He stated that on Friday evening, he, the appellant, and the deceased had been out drinking beer and whiskey at several night clubs in the area between Birmingham and Tuscaloosa. He stated that his half brother worked at the construction site at the new Mall near Bessemer, and that he had been paid $150.00 on Friday as he got off work. He further testified that when he came back on the second occasion on Saturday, the two men had been shooting a .22 caliber pistol, which belonged to the deceased, and the deceased also owned a 30–30 Winchester rifle.

The State next called Deputy Sheriff Walter A. Howell, Jr., who testified that he and Chief Deputy Warren Miller had gone to the residence of the deceased on September 15, 1969, arriving there about 11:00 in the morning. He stated the house was locked from the outside with a padlock. Upon entering the house through a window, they found the body of the deceased lying on the bed, clothed in his underwear. He stated that the Winchester rifle was on the top of the bed by the body, and that under the mattress he found a .22 caliber pistol. He stated that the 1967 Dodge Dart automobile was missing, and that four days later he was notified that this automobile had been found in LaFayette, Louisiana, by the Sheriff's Department there.

Officer Howell described the interior of the house as follows:

"Q. Officer Howell, if you will, would you describe—you testified about finding the alleged victim in the bed. Would you describe the area around the bed, the floor and whatnot, the condition of the bed when you found it that morning?

"A. The victim was laying in the bed with the covers pulled up about his chest and, of course, the bed itself was soaked with blood. There was enough blood it had come through the mattresses and had run out on the floor and as I stated before, the room was, the furniture was arranged. There wasn't any sign of any struggle.

"Q. O.k., and State's exhibit 2 which you have already testified to, when you found the pistol there the morning of the 15th of September, that you have spoken about, did you examine the gun at that time?

"A. Yes, sir.

"Q. And would you tell us what, if anything, you found in the chamber of the gun?

"A. There were six empty 22 shells in the chamber.

"Q. And do you know where those shells are today, the empty cartridges?

"A. No, sir, I don't.

"Q. But you say at the time you found it, there were six empty cartridge shell cases?

"A. Yes, sir.

"Q. That had been fired?

"A. Yes, sir.

"Q. And did you find any other cartridges or casings there in the house?

"A. Yes, sir, I found six fired 22 hulls in a coal scuttle at the left of the fireplace."

Officer Howell further testified that he was subsequently notified that the appellant had turned himself in to the Stockton, California, police, and upon going to Sacramento, California, he was allowed to interrogate the appellant at the County Jail in Sacramento, California, at about 11:00 in the morning, in the presence of himself and one other officer, but before talking to the appellant, the following *Miranda* warning was administered:

"Your rights. Before we ask you any questions, you must understand your

rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer. Waiver of rights. I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me. Signed—Billy Don Clark."

The appellant's statement taken at this time is as follows:

"Sacramento, California County Jail
10–8–69
11:10 a. m.

"Statement from Billy Don Clark, white male, address—County Jail, Sacramento, California. Date of birth, 5–24–40. After advising the suspect of his rights, he agreed to give a statement free and voluntary. The statement is as follows:

"I had an argument with my wife. We were living in Fort Smith, Arkansas. I was working for the Trinity Baptist Church in Fort Smith. After this argument, I decided to leave. I went to the bus station and bought a ticket for Birmingham, Alabama. I thought I would go to Birmingham because it was in the South and maybe the people would be friendly. I was going to try to get a job. I arrived in Birmingham about 10 or 11 p. m., Friday, September 12. I was just walking around and I saw the Bluebird Cafe open and decided to get a cup of coffee. I went inside and ordered a cup of coffee. After I got inside, I saw everybody was drunk, so I drank my coffee and hurried out. I walked on up the road across an overpass and went into a Shell Service Station. While I was at this service station, I met Don Gwin. His half brother was in the car passed out. They said they had been out drinking. Don Gwin invited me to go home with him to spend the night. When we got to Don's house, Don, his half brother and I went in the house and went to bed. Don slept on the bed by the door in the front room. I slept on the bed next to his and his half brother slept on the bed in the back room. We all got up about noon Saturday, September 13, 1969. After we got up, his half brother said he had to go home, so he left. Don had some guns and showed them to me and asked me if I wanted to shoot them. I told him I didn't know much about guns. I shot the 22 once or twice and missed what I was shooting at. He took the gun and shot it some. While we were out in front of the house shooting, Don's half brother came back over with a friend. We talked about fifteen minutes and they left. They said they had to go to a party. Don took the 22 pistol and a 30–30 rifle back into the house and put them up. I stayed on the porch while he went inside. He came back out and we tried to fix the lawn mower so we could mow the lawn. We couldn't get it fixed. By this time, I had ran out of cigarettes and Don said 'let's go to the store and get some.' We went to this country store in a little old town. I don't remember the name of the town. We bought a carton of Winston's, a carton of Camel's, a chicken, some soup and he bought some gasoline. We went back over to Don's house and got ready and went to town. After we left Don's house, he looking [Sic] for two men who lived way out in the country. Don said these men owed him some money. We looked for them

about an hour, but couldn't find them and we drove on to Tuscaloosa. We stopped at a big Pure Truck Stop outside Tuscaloosa near the Interstate. Don was talking to a waitress at the truck stop. He said he had a date with her for Wednesday night. I also heard him talking to her about some pills. I went outside and got into the car and Don came later and we left. We went on down the freeway toward Tuscaloosa and met a car going in the opposite direction. They waved at Don and he turned around and tried to catch them. We did not catch them. In the process of his turning around, a bottle of whiskey slid from underneath the seat. The bottle hit my foot and I picked it up and started to hand it to him. He said they had the whiskey the night before and he did not think about it. He said 'open it and we will have a drink.' We drank the whiskey before we got to town. The brand of whiskey, as I recall, was Southern Comfort. We went over to the college to an apartment Don had worked on. He said he wanted to see a boy named 'Speedy.' I don't know the name of the apartments. Don said he wanted to get some more marijuana. Don had one stick of marijuana and we had already smoked this. We didn't find 'Speedy' at the apartments, so we drove on to a bar about fifteen blocks away. I don't remember the name of the bar. 'Speedy' wasn't there and Don got kind of mad and squealed the tires coming away from the bar. We went on down to another bar. I didn't know the name, but there was a high curb in front. We went inside, and started drinking beer. We stayed here about an hour. While we were there, I was talking to a girl who worked there. We drank about six beers apiece. We left this bar and Don knew this nightclub where you had to pay $1.00 each to get in. We went inside and listened to the band and I talked to some member of the band. We didn't stay long at the nightclub. We went back to the same bar we just left from and stayed there until they closed. We left there and went to a truck stop. The truck stop was located about twelve blocks past a bunch of railroad tracks on the right. We went inside, the truck stop and ate. While we were at the truck stop, I was talking to some colored guys about a place to party. He said he knew just the place and directed us to the '61' Club. Before we left the truck stop, Don handed me four or five pills. He said they were diet pills and they would keep you from having a hangover. He also told me that they wouldn't hurt me, so I took them. We went on to the '61' Club and looked it over and decided not to stay. After we left the '61' Club, we decided to go to Don's house. On the way to the house, things began to get fuzzy. I remember the curves in the road and Don driving fast. He was saying how cool it was and that his car would really talk to the curves. He began pinching me on the leg. It didn't hurt, so I didn't think too much about it. It was like I was in a daze. When we arrived at Don's house, he went inside. I was having trouble getting out of the car, but I finally made it in the house. I went on through the bedroom to the bathroom and vomited. I came back into the front bedroom. Don had some bologna sandwiches and cokes and wanted me to eat some. He told me 'daddy's is going to feed you,' and tried to make me eat. All of a sudden, the gun appeared in my hand and blood was on Don's head. He was making a gurgling noise and I knew he was dead. I then covered him up, I thought if I covered him up, he would be alright and wouldn't get cold. I put the pistol under the bed. I thought if I put it there, it couldn't hurt anyone. I got the car keys from Don's pants pocket. I went outside and locked the door and left. It had to be about 3 or 4 o'clock in the morning. It was still dark outside. I drove the car to La-Fayette, Louisiana, and I had a hitchhiker, but I don't know where I picked him up. The car was almost out of gas, so I

parked it in front of a dormitory. I then went over to the Salvation Army to go to church. I just had to go to church. After I went to church, I went to bed about 8 o'clock. I left about 6:30 or 7 o'clock the next morning. This old man went with me because I didn't want to travel alone. We went to Lake Charles, Louisiana, and he wanted to stay at the Salvation Army. I registered, but decided not to stay, so I went on. I left Lake Charles about 9 p. m. headed for Houston. I got to Houston about 8 or 9 the next morning. I walked almost all the way around Houston, then a man gave me a ride to a small town. There I got a ride with a fellow who was going to Los Angeles. I arrived in Los Angeles Wednesday about noon. I decided to go to Northern California. I got a job picking peaches. I decided to go to Bakersville and got a job with Richland Land Company. I worked for six days and decided to go back to Alabama and give myself up. I got as far as Dallas and I began to think about being electrocuted. I came back to California. I decided to go to Stockton and confess to the crime I had committed in Alabama. I waved a patrol car down and told them what I had done, so they took me to the jail. I have read the above statement. It is correct to the best of my knowledge. Signed—Billy Don Clark."

The State also presented the testimony of Special F.B.I. Agent Stewart A. Morley, who testified that he interviewed the appellant on October 6, 1969, at the San Joachim County Jail at French Camp, California, pertaining to a Dyer Act violation, but prior to interrogating the appellant, he, too, had given the appellant a *Miranda* type warning, which the appellant then signed, indicating that he had been advised of his rights. Following this, the appellant gave a statement in the presence of this officer and Agent Warren Little, which is substantially the same as that subsequently given the two State deputy sheriffs, with the following addition:

". . . Shortly after arriving at the cabin, I remember going to the bathroom where I threw up and came back to the living room of the cabin. The next thing I remember was me standing in the living room with the 22 revolver in my hand and Don lying on one of the beds with blood gushing from his head. I recall seeing blood spots on the wall. I recall Don making gurgling sounds, so I covered him up with a purple bedspread and put the revolver under the bed covers of the other bed. I recall leaving the cabin and locking the front door. I remember getting in Don's car and turning on the lights and starting it up. The next thing I remember is that I was driving Don's car on a Louisiana Highway about five miles from LaFayette, Louisiana. I had picked up a young white man as a hitchhiker who I let out in LaFayette. I parked the car in front of a building that looked like a dormitory, and left the keys in the ignition. I arrived in LaFayette about 6 p. m., and attended a Salvation Army service that Sunday Evening. I do not know why I shot Don because I did not have any reason to kill him. I am very sorry about the whole thing. I have read this statement consisting of this and three other pages. I have initialed any corrections appearing thereon. This statement is true and correct. Signed—Billy Don Clark. Witnessed: Stewart A. Morley, Special Agent, FBI, Sacramento, October 6, 1969, Warren L. Little, Special Agent, FBI, Sacramento, October 6, 1969."

At the close of the State's evidence, the appellant moved to exclude same, which was overruled.

Defense Witness John David Suits testified he had known the deceased at Draper Prison, that he had spent two nights with him at Tuscaloosa, and knew that the deceased used drugs and drank a lot.

The appellant then took the stand in his own behalf, testified that he was thirty-two years of age, that he was born in Paul's Valley, Oklahoma, and grew up in Okla-.

homa, going through the eleventh grade in school, that he had served in the United States Navy, and that he had been married and divorced. He stated that he left Fort Smith, Arkansas, after divorcing his wife and went to Canada, then to Spokane, Washington, and following this, hitchhiked and drove trucks from Bakersfield, California, to Oklahoma City, Oklahoma, from there to Memphis, Little Rock to Nashville and Bristol, Virginia. He stated that he left Bristol, Virginia, headed for Chattanooga and Birmingham, and had planned to go to New Orleans to work on an offshore oil rig. He stated he arrived in Birmingham on September 12, 1969, and that some man with whom he got a ride dropped him near the Blue Bird Cafe. He stated that he then went over to Jack's Shell Service Station, where he met the deceased, Donald Richard Gwin. He stated that the deceased and his half brother, Randall Shattuck, were getting some gasoline and offered him a ride. From that point on, the appellant's testimony is substantially the same as that herein set forth, with the addition of the following response under questioning:

"Q. Do you remember shooting Donald Gwin?

"A. No, I don't.

"Q. If you did.

"A. I could have done it. I was there, I guess, when it happened, but I don't remember shooting him.

"Q. Do you know if anybody else was at that cabin at that time?

"A. No, I don't."

The appellant offered to present the testimony of Martin Webber, the Chaplain at Atmore Prison Farm, as to his reputation for truth and veracity, which offer of proof was ruled inadmissible.

## I.

Appellant asserts that the trial court committed reversible error by not providing the appellant, an indigent, the assistance of medical experts to offer testimony in support of his plea of not guilty by reason of insanity.

From the record:

"MR. DAWSON: This motion I filed this morning for employment of medical experts.

"THE COURT: I have read and considered the same. I know of no funds that would be available. Dr. Fowler has a clinic out here as a psychiatrist. We have some psychiatrists in town, but I don't know how they can be employed.

"MR. HARRIS: There is Dr. Sharman and then they have that University thing out there. Mr. Thompson uses them quite often, psychologists.

"THE COURT: You propose to show by this testimony the defendant was— without admitting he committed the act, if he did commit the act, that he was in such a state of intoxication or under the influence of drugs to such capacity to know right from wrong?

"MR. DAWSON: Yes, sir.

"THE COURT: Mr. D. A., do you know of any funds available?

"MR. HARRIS: No, sir, I don't. In the seven years I have been here and I don't know when we have ever hired one. I know the sheriff has worked with the lawyers on this thing out at the University. That might be something he can look into.

"THE COURT: I would recommend you contact the psychological clinic at the University. They probably operate with Federal funds.

"MR. DAWSON: I will attempt to see if I can work something out there, but if not, may I have leave to approach the court in the next week or so?

"THE COURT: Yes, sir. I will have to state now as far as my ordering any financial aid, I don't have any control of any funds that I know of. I can't just

ask the psychiatrist to do it without any remuneration.

"MR. HARRIS: The only other thing I would know is to file under the appropriate section and have the defendant sent to Bryce Hospital for evaluation and whatnot.

"THE COURT: As I understand, you didn't want to have him committed to Bryce?

"MR. DAWSON: No, sir.

"THE COURT: Well, let's see, I better show this motion taken under advisement, gentlemen, and you can contact the people at the psychological clinic at the University of Alabama. They have been very cooperative and we will ask the sheriff to make Billy Don available for private interviews with these people and I am sure he will. If by trial time, it depends on paying someone to do those interviews, I will just have to write it up as overruled unless the University Clinic will do it as you yourself are doing, donating your services, you might say. Alright, next item."

As may be seen, the trial court offered the appellant the assistance of such psychiatrists as might be available at the University of Alabama Clinic in Tuscaloosa, and, in fact, the appellant was taken there and examined by the medical assistants, but he was unable to obtain the testimony of a trained psychiatrist. Moreover, the trial court offered to have the appellant committed to Bryce Hospital for examination under the provisions of Title 15, Section 425 et seq., Code of Alabama 1940. This was refused by appellant's counsel.

It is, therefore, clear that the trial judge exhausted all available sources to assist the appellant in presenting evidence in support of this plea.

This Court has carefully examined the opinion of the United States Fifth Circuit in *Brinks v. Alabama*, 465 F.2d 446, and is not aware that this opinion requires the State to furnish an indigent with expert psychological assistance merely upon a motion by counsel. Here, as distinguished from Brinks, no evidence was offered in the trial court by way of letters or testimony on preliminary inquiry by the trial judge to support appellant's contention. Moreover, the trial court here was most solicitous of appellant's position and offered such means as were available. Under these circumstances we are clear to the conclusion that there was no denial of due process or equal protection of law under *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815, in the case at bar.

## II.

During the qualification of the jury, the following occurred:

"MR. DAWSON: One of the defenses in this case is that Billy Don Clark would be not guilty by reason of insanity. Do any of you believe it would be necessary to bring medical testimony or a medical doctor or an expert in order to prove that fact, the fact of insanity?

"MR. LACKEY: Judge, I think that might be a point later calling for legal instructions.

"THE COURT: I think we are getting a little far afield here, Mr. Dawson. I don't want to get into any issue that might come up on voir dire examination. I want to give you plenty of latitude, but if we get into this, I am afraid we would get bogged down on collateral issues as far as voir dire is concerned.

"MR. DAWSON: Except. That is all."

Title 30, Section 52, Code of Alabama 1940, is as follows:

"*Examination of jurors.*—In civil and criminal cases, either party shall have the right to examine jurors as to their qualifications, interest, or bias that would affect the trial of the case, and shall have the right, under the direction of the court, to examine said jurors as

to any matter that might tend to affect their verdict."

In *Smith v. State*, 36 Ala.App. 624, 61 So.2d 698, reversed on other grounds 258 Ala. 86, 61 So.2d 707, we find:

"The purpose of the privilege is to afford information to the parties relating to the qualifications of the jurors, so that the right of peremptory challenge may be exercised advisedly. It is not contemplated that the right should extend to questions concerning matters which involve intricate legal principles. Primarily the inquiry should relate to information which has to do with the interest or bias of the jurors. *J. B. McCrary Co. v. Phillips*, 222 Ala. 117, 130 So. 805."

Not only does the testimony of medical experts involve intricate legal problems, but additionally such testimony is not binding upon the trial jury. *George v. State*, 240 Ala. 632, 200 So. 602; *Hockenberry v. State*, 246 Ala. 369, 20 So.2d 533.

Clearly, therefore, the trial court properly refused to allow appellant's counsel to examine the jurors on the grounds indicated.

### III.

The appellant seeks to assert as error the fact that when the F.B.I. agents interrogated him in California pertaining to a possible Dyer Act violation, he was not specifically advised that he was also wanted in connection with the homicide in question.

We have carefully examined the predicate laid in the instant case and find that such fully comports with *Miranda v. Arizona*, 384 U.S. 436, 83 S.Ct. 1602, 16 L.Ed. 2d 694, and, in addition, we find that its pre-*Miranda* predicate was also properly laid.

Moreover, where, as here, appellant takes the stand in his own defense and gives testimony substantially the same as the language of the confession here placed in evidence, any such asserted defect may not work a reversal. *Boulden v. State*, 278 Ala. 437, 179 So.2d 20; *Chandler v. State*, 283 Ala. 29, 214 So.2d 306; *Jones v. State*, 50 Ala.App. 36, 276 So.2d 621.

### IV.

Appellant asserts as error the refusal of the trial court to allow him to present the testimony of Chaplain Martin Webber as to his reputation of truth and veracity in the community in which he lived.

The trial court correctly refused to allow such testimony to be admitted, because the appellant's credibility had not been impeached. *Lassiter v. State*, 35 Ala.App. 323, 47 So.2d 230, cert. den., 254 Ala. 5, 47 So.2d 233. Moreover, the appellant was here seeking to bolster his own testimony by proof of such good general reputation. *Funderberg v. State*, 100 Ala. 36, 14 So. 877, McElroy, Law of Evidence in Alabama, Vol. 1, § 176.01(2).

### V.

Finally, appellant asserts that evidence should have been allowed by the trial court "which would have reflected on the motive which others might have had for committing the criminal act." The appellant cites us to no authorities in support of this contention.

In the case at bar, there was no evidence presented which tended to show which third party, or parties, may have had some connection with the offense in question. Moreover, there was absolutely no evidence offered which tended to connect a third person, or persons, with the crime in question. Clearly, therefore, the trial court's ruling is correct. *Tatum v. State*, 131 Ala. 32, 31 So. 369; *Walker v. State*, 139 Ala. 56, 35 So. 1011.

We have carefully examined this record, as required by Title 15, Section 389, Code

of Alabama 1940, and find no error therein. The judgment of the trial court is due to be and the same is hereby

Affirmed.

All the Judges concur.

*On Rehearing*

 Appellant asserts in brief that, since the provisions of Title 45, Section 226, Code of Alabama 1940, exempt physicians from having to honor a subpoena under certain conditions, under the provisions of Title 15, Section 425 et seq., Code of Alabama 1940, indigent appellants have no "effective means to procure the testimony of medical experts as would be available" to appellants financially able to pay such experts.

This argument overlooks the opinions of this Court in *Sheppard v. State*, 49 Ala. App. 398, 272 So.2d 605, and *Rich v. State*, 51 Ala.App. 556, 287 So.2d 873, which answer this question.

Opinion extended, application overruled.

All the Judges concur.

CATES, P. J., concurs in result only.