297 So.2d 175

**Luther CARTER**

v.

**STATE.**

**3 Div. 257.**

Court of Criminal Appeals of Alabama.

June 28, 1974.

N. T. Braswell, III, Montgomery, for appellant.

William J. Baxley, Atty. Gen., and Don C. Dickert, Sp. Asst. Atty. Gen., for the State.

HARRIS, Judge.

Appellant was indicted for murder in the first degree. He was convicted of manslaughter in the first degree and his punishment fixed at eight (8) years imprisonment in the penitentiary. He was represented by retained counsel who represents him on appeal.

On the 25th day of November, 1972, appellant and his wife were visiting in his brother's home in a rural community in South Montgomery County. His brother was not at home at the time. Present at the time were his brother's wife, two children and a man who came to get a haircut. Appellant's brother was a pulpwood operator and cut hair as a side line when he wasn't bootlegging.

It was a cold and rainy November afternoon and everyone was gathered around an open fire place except the two girls, ages eleven and fifteen, who were in the kitchen making cookies. No one was drinking in the house. Late afternoon on this date the deceased knocked on the front door and appellant's brother's wife asked her youngest daughter to see who was at the door. The deceased, Andrew Derrico, was well known to appellant's brother's family as he had worked in the pulpwood business with appellant's brother, was a distant cousin to his wife, and had visited in the home on several occasions. The deceased was known as "Buddy Man" and "Big Charlie". The young girl reported to her mother that "Buddy Man" was at the door and her mother told her to let him in. Appellant got up and walked out of the room followed by the man who was there for a haircut. Appellant went to the front door and told the deceased he could not come in, that his brother was not at home and he did not want him around his brother's children. Appellant's brother's wife told him to let that boy alone, "We know him and he comes here all the time." Appellant did not know the deceased and had never seen him before. The screen door was latched

and as the deceased reached for the door handle, appellant fired one shot with a pistol striking the deceased in the mid-chest and he staggered around a few seconds and sat down on the top doorstep with his head bowed and died before the ambulance arrived. Upon hearing the shot appellant's brother's wife went out on the porch to see if she could aid the deceased and appellant said to her, "If you touch him, I'll blow your heart out." She further testified that the deceased did not say anything to appellant before the shot was fired.

Appellant and his wife got in his pickup truck and drove from the scene. On the way home, appellant gave the pistol to his wife and told her to throw it out of the truck and he thought she did. She kept the pistol and surrendered it to the Sheriff's deputies a day or two later.

Tom Jordan, the man who was there to get a haircut was an eye witness to the shooting. According to his testimony, he followed appellant to the door and was standing close behind him. He heard appellant tell the deceased to stand back and he backed up a few steps and started to reach for the screen door again. Appellant told him again to back up and then fired the fatal shot. This witness said the deceased never opened his mouth to appellant and, as a matter of fact, never uttered a word. This witness further testified that he did not see anyone drinking at this house that afternoon prior to the shooting. After the shooting occurred Jordan asked appellant to take him to his home and appellant carried him.

Appellant went to the county jail that night and turned himself in to the Sheriff's Department. The officers gave him the *Miranda* warnings and he told the officers he understood his rights and signed a waiver form. He voluntarily made and signed the following statement:

" 'I was at my brother's house, Julius Carter, sitting around the fire with my wife, Eva Mae, my brother's wife Thelma, and his two younger daughters. My brother had gone up the road to pull a man out of the ditch. This man who I had never seen before came to the door. One of the little girls went to the door and wouldn't let him in. They called their mother, and she wouldn't go, so I went to the door. The man told me he wanted to see Julius. I told him he had gone up the road, and you'll have to wait till he comes back. He reached to pull the door open with one hand and reached in his pocket with the other. I waved the children back; and as he reached for the door, I shot him with my .38 pistol one time. He kind a laid over and I thought maybe I had missed him. He acted like some kind of robber or something. I had never seen him before and was not going to let him in my brother's house. I walked back through the house and told my sister-in-law, "Well, I hit him." We stayed until my brother got there. I left and come on home with my wife and then came down to turn myself in. I came on toward home and stopped two or three times.

My wife through (sic) the pistol out on Turnipseed Hill. I didn't think that I had hit the man, he demanded it.' "

The interrogating officer testified on cross-examination that appellant was almost drunk when he came to the jail and by that he meant that "he had been drinking to the point that he was very arrogant and boisterous, and talking loud." The officer recanted the statement that appellant was drunk, saying, "He had had enough to make him real high. He had had a good bit to drink." He said he took down the statement just as appellant gave it to him. The statement was written by one deputy in pen and ink. It was read to appellant and he said it was true and correct and he signed his name thereto and the other deputy witnessed the confession. After the proper predicate was laid, the confession was received in evidence.

Appellant's wife testified in his behalf. According to her the little girl was not asked to go to the door but, on the contrary, her sister-in-law asked appellant to answer the door. She said her husband had not been drinking that afternoon prior to the shooting. She said that after Tom Jordan got out of the truck at his home, she and her husband were enroute to their home in Montgomery when he gave her the pistol and told her to throw it out of the truck. She said instead of throwing the pistol away, she put it in her pocketbook and gave it to the officers when they came to her house later.

Testifying in his own behalf, appellant said he bought twelve (12) cartridges that morning before going to his brother's house and he put six (6) of them in his pistol. He said he purchased the pistol from someone on the street and did not have a pistol permit; that he usually carried the pistol in the glove compartment of his truck but when he walked in his brother's home, he put it in the front pocket of his hunting clothes. He further testified that he and his wife had been in the house an hour or two when he heard a knock on the door; that his brother's wife asked her little daughter to go to the door and a few minutes later he went to the door at her request.

He said he did not know the man at the door and had never seen him before. He denied that the little girl identified the man as "Buddy Man" and further denied that his brother's wife said she knew him and to let him in the house. The man told appellant he wanted to see Julius Carter and he relayed the message to his sister-in-law and she told him to tell the man that Julius was not at home and to come back later. Appellant said he asked her if he should let the man in and she said, "No, don't let him in." Appellant told the man to leave as the man of the house was not there. He said the man reached for the screen door and he pulled his pistol. The man saw his pistol and said, "That means nothing", and he saw him reach back to his hip pocket; that he thought he was a robber and he pulled the trigger one time and shot the man through the screen door.

On cross-examination he admitted that the child told her mother that the man at the door was "Buddy Man" and that he heard his sister-in-law say, "Let him in, we know him."

An Assistant State Toxicologist performed an autopsy on the body at a local funeral home. After proper qualifications, he was asked the cause of death and stated:

"In my opinion, death is attributed to shock, hemorrhage, and trauma associated with this gunshot wound to the chest."

Prior to trial appellant filed a sworn motion to quash the indictment, alleging:

"That he is a member of the Negro race, that Negroes are systematically excluded from the jury roll of Montgomery County, Alabama, because of their race and that the Grand Jury which indicted defendant herein was selected from said jury roll or jury box of Montgomery County, Alabama, from which eligible Negroes are excluded by reason of their race, in violation of defendant's right to equal protection of the law as is guaranteed by the Fourteenth Amendment to the Constitution of the United States."

Appellant filed a motion to quash the trial venire on identical grounds.

The following stipulation was entered into by and between the State of Alabama and appellant:

"STIPULATION

STATE OF ALABAMA
Vs. #7937
LUTHER CARTER

"It is stipulated and agreed by David W. Crosland, District Attorney for the Fifteenth Judicial Circuit of Alabama, and N. T. Braswell, Attorney for Defendant, Luther Carter, and at all times pertinent

to the selection of the Grand Jury which indicted Defendant, Luther Carter, herein and the selection of the trial venire or list of regular and special jurors selected for the trial of this case on June 11, 1973, the following facts were true and correct:

"1. That defendant, Luther Carter, is a member of the Negro race.

"2. 83,055 people in Montgomery County, Alabama, are between the ages of twenty-one years and sixty-five years.

"3. That the jury roll of Montgomery County, Alabama, contains the names of 7,400 persons and that 6,468 of these are on jury cards placed in the jury box of Montgomery County, Alabama.

"4. That 12% of the persons on the jury roll are Negro and that 30.7% of the people in Montgomery County, Alabama, eligible by age for jury service are Negro.

"5. That the Grand Jury which indicted Luther Carter herein and the trial venire or list of regular and special jurors selected for the trial of this case on June 11, 1973, were picked in the same manner as is described in the testimony of John Matthews, Clerk of the Circuit Court of Montgomery County, Alabama, in the case of State of Alabama vs. Richard C. Boone and State of Alabama vs. Jimmy Lee McCloud.

"STATE OF ALABAMA

By David W. Crosland

David W. Crosland, District Attorney for the Fifteenth Judicial Court of Alabama

"LUTHER CARTER

By N. T. Braswell

N. T. Braswell, Attorney for Defendant Luther Carter

"Filed June 11, 1973"

It was further stipulated that the answers of Hon. John R. Matthew, as Clerk of the Jury Commission of Montgomery County to interrogatories filed by the plaintiffs In The United States District Court For The Middle District of Alabama, Northern Division, in Civil Action No. 3589–N, styled Willie Penn, etc., et al., Plaintiffs v. Polly Eubanks, etc., et al., Defendants, would be admitted in evidence in support of the motions to squash.

In the *Penn* case the United States District Court held that the jury roll and the jury box of Montgomery County did not meet the constitutional tests in the selection of juries in this County. Specifically the court found that the jury selection system of Montgomery County was discriminatory on the basis of race and sex and granted mandatory relief on the 6th day of June, 1973, five days before appellant was put to trial in the Circuit Court of Montgomery County. Penn et al. v. Eubanks et al., D.C., 360 F.Supp. 699.

In granting the relief sought in *Penn*, supra, the Court said:

"The relief that must be afforded in this case will involve both a prohibitory and a mandatory injunction. This means that there must be a cessation of the use of the Montgomery County jury roll and a complete emptying of the jury box as it now exists within not more than four (4) months from this date. The defendants will be allowed until that time to compile a jury roll and refill the jury box for Montgomery County in strict accordance with the law of Alabama and the constitutional principles herein set forth. * * *"

A copy of the Writ of Injunction was presented to the Circuit Court of Montgomery County at the time appellant's case was called for trial. In the light of *Penn*, supra, appellant insisted on his motion to quash the indictment and his motion to quash the venire. Appellant also moved for a continuance. the trial court denied *all* motions, and put appellant to trial.

■ We do not construe the order and opinion of the United States District Court to mean that all *jury trials* in Montgomery County must come to an end pending the four (4) months time allotted the jury

commission to compile a new jury roll and to refill the jury box for Montgomery County. Had the District Court so intended it would have broadened the mandatory injunction and plainly said that all jury trials in Montgomery County are at an end pending the compiling of a new jury roll and refilling the jury box. We must, therefore, treat this case as if the mandatory writ of injunction had not been issued.

■ Neither the jury roll nor the venire need be a perfect mirror of the community nor accurately reflect the proportionate strength of every identifiable group. Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759; Carter v. Greene County, 396 U.S. 320, 90 S.Ct. 518, 24 L. Ed.2d 549; Mitchell v. State, 50 Ala.App. 121, 277 So.2d 395.

In *Swain,* supra, Mr. Justice White writing for the majority said:

" 'Venires drawn from the jury box made up in this manner unquestionably contained a smaller proportion of the Negro community than of the white community. But a defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury which tries him nor on the venire or jury roll from which petit jurors are drawn. * * * ' "

*Swain* was followed by this court in Junior v. State, 47 Ala.App. 518, 257 So.2d 844, and *Mitchell,* supra.

The trial court did not err in overruling all motions made and filed by appellant concerning the jury roll and the jury box of Montgomery County, including the motion for a continuance based on the Federal court order and decision.

■ Appellant contends that he was intoxicated at the time he made the confession and therefore the confession was involuntary and inadmissible. The law is clear that proof of intoxication amounting to *mania* or such an impairment of the will and mind as to make the person confessing unconscious of the meaning of his words renders a confession so made by him inadmissible, but a lesser state of intoxication will not render the confession inadmissible. The voluntariness of an alleged confession is a question of law for the court and should be decided by the trial court upon preliminary proof, showing the circumstances surrounding the alleged confession, taken outside the hearing of the jury, and such finding will not be disturbed unless it appears contrary to the great weight of the evidence or is manifestly wrong. Stewart v. State, 49 Ala.App. 681, 275 So.2d 360.

The rule announced in *Stewart,* supra, was fully complied with in this case and the confession was properly admitted in evidence.

■ Appellant duly reserved an exception to that portion of the oral charge of the court wherein the court charged the jury. "The law presumes one to intent (sic) the natural and probable consequences of his act."

This court, quite recently, in the case of Hall v. State, 49 Ala.App. 381, 272 So.2d 590, condemned charges of like import. Such an instruction to the jury makes the subjective intent of the defendant the determining factor whether a crime has been committed at all. We hold such charge to be error under *Hall,* supra.

There are other matters pressed upon us for a reversal of this case but in the light of another trial these matters will probably not arise.

For the error pointed out, the case is due to be reversed and remanded for a new trial.

Reversed and remanded.

All the Judges concur.