Appellant was convicted under § 13-11-2 (a)(5), Code 1975, for the murder of Coffee County Sheriff Neil Grantham. After a separate sentence hearing on aggravating and mitigating circumstances, the jury fixed the punishment at death. Subsequently, the trial court weighed the aggravating and mitigating circumstances pursuant to § 13-11-3 and § 13-11-4, Code 1975, and sentenced appellant to death. The court issued written findings of fact which set forth the aggravating circumstances the court found sufficient to support the sentence of death.[1]
Thomas Weeks, a Coffee County Deputy Sheriff, testified he was employed as the county jailer on March 1, 1979, under Coffee County Sheriff Neil Grantham. The witness stated he observed appellant, whom he recognized as a former jail inmate, sitting in a car parked in Sheriff Grantham's parking space at approximately 6:45 a.m. Shortly before 7:00 a.m., he observed Sheriff Grantham drive up and park his vehicle. He got out of the automobile, walked to some garbage cans and deposited a trash bag, and then walked towards the jail door. Appellant got out of his automobile with something in his hand and met Sheriff Grantham at the rear of the car. At that point, Deputy Weeks heard three gunshots and saw Sheriff Grantham fall. The witness then turned back into the jail and obtained a gun. He observed appellant get back into his car and saw that he held a pistol in his hand. He exchanged fire with appellant as he drove away. Deputy Weeks then went over to where Sheriff Grantham lay on the ground and observed that the Sheriff's face was blue and that he appeared not to be breathing, having apparently been hit in the face and neck. Deputy Weeks stated he observed no one else in the area at the time the Sheriff was killed.
William Hurd testified he answered a call as a member of the Elba Rescue Squad on March 1, 1979. He observed Sheriff Grantham on the pavement in the front of the jail. They placed the Sheriff in the ambulance and transported him to the Elba General Hospital emergency room.
Dr. Bruno Santa Rossa stated he observed Sheriff Grantham at the Elba General Hospital on the morning of the shooting and, after assessing his condition, pronounced him dead upon arrival.
Dr. Richard Roper of the Alabama Department of Forensic Sciences testified he examined the body of Sheriff Grantham on March 1, 1979, in Elba and found three gunshot wounds to the chest, right face, and left side of the head. In his opinion, Sheriff Grantham's death was caused by acute hemorrhage and central nervous system trauma, due to multiple gunshot wounds to the body and head. On cross-examination, he testified his notes reflected that the body exhibited a set of natural teeth. He identified a photograph of Sheriff Grantham as that of the man he examined on March 1, 1979.
Billy Ray Cooper stated he became acquainted with appellant as a fellow inmate at the Coffee County Jail in 1976. Toward the end of 1977, he heard appellant state on two or three occasions that he was being held without any reason and that he would "get even and kill that S.O.B.," referring to Sheriff Grantham. On cross-examination he was asked when this occurred. He stated it was in November, and that on the third occasion, appellant struck the jailer and tried to go downstairs to get to the Sheriff.
James Kenneth Holder, another fellow inmate of appellant's, testified he heard appellant state that they had no reason to hold him in jail, that he didn't belong there, and that he was going to get even one way or the other. The State rested at the close of Holder's testimony, and appellant's motion for acquittal, based upon the State's failure to prove a prima facie case, and motion to exclude were denied. *Page 921 
The appellant called Ms. Bernice Clay who stated she was the record keeper for Dr. James L. Clay. The records indicated that Dr. Clay, a dentist, had relined a set of upper and lower dentures for Sheriff Grantham in 1969.
The defense next called Dr. William H. Rudder to testify. Dr. Rudder, a psychiatrist on the staff of Searcy Hospital, did not appear. The trial court refused to issue a bench warrant for his appearance after it was learned that the Sheriff's office, in the county where Dr. Rudder was located, was closed for a legal holiday and it could not be ascertained if Dr. Rudder had actually been served with a subpoena. Appellant's counsel conceded to the trial court that by statute a member of the Searcy staff could not be compelled to attend court proceedings. After the court denied appellant's motion for a continuance to perfect service on Dr. Rudder, a deposition taken from Dr. Rudder was read into evidence at appellant's request in lieu of Dr. Rudder's appearing at trial.
Dr. Rudder stated in his deposition that he had examined appellant on July 3, 1979. His final diagnosis after 8 to 10 hours' observation of appellant over a period of 10 months was paranoid type schizophrenia in partial remission on medication. He stated that this was a mental disease, and in his opinion, appellant did not know right from wrong at the time of the alleged offense on March 1, 1979. Appellant was completely out of touch with reality and, in Dr. Rudder's words, would be considered "crazy" under any definition in any part of the world. At the end of the time appellant spent at the institution, he was in fairly good remission from the mental disease as a result of drug therapy. The defense rested after presenting Dr. Rudder's deposition.
The State called Dr. Donald Crook as a rebuttal witness. Dr. Crook, a medical doctor practicing in Alabama, examined appellant for 30 minutes at the request of the circuit court on June 6, 1979. He found appellant's behavior and answers were appropriate to the questions asked of him. In his opinion, appellant was sane at that time and exhibited no symptoms indicative of schizophrenia. Dr. Crook testified he was also familiar with appellant, having treated him for minor ailments on a couple of occasions from the time appellant was 15 years old.
Dr. Bancroft Cooper, a practicing physician in Elba, testified he examined appellant for 20 minutes on June 6, 1979 at the circuit court's request. In Dr. Cooper's opinion, appellant was not insane at the time he examined him.
Douglas McKeown, a licensed clinical psychologist, examined the appellant over a period of 8 to 10 hours on April 23 and April 27, 1981, at the Houston County Jail in Dothan, Alabama. Appellant's objection to the introduction of Dr. McKeown's testimony, based upon privileged communication and equal protection, was overruled. In Dr. McKeown's opinion, appellant knew the difference between right and wrong on March 1, 1979. His diagnostic impression was, however, that appellant was suffering from paranoid schizophrenia, a disease of the mind. Dr. McKeown had never seen appellant, however, when he was not under the medication prescribed for his mental problems. The State rested at the close of Dr. McKeown's testimony and requested that the court dismiss Counts 3, 4, and 5 of the indictment. Appellant's motion to exclude the evidence as to Counts 1 and 2 for failure to prove the Sheriff was "on duty" was denied.
 I
Appellant argues the jury's verdict was contrary to the law and the evidence presented, in that the jury should have returned a verdict of not guilty by reason of insanity.
In reviewing the question of insanity, the court must apply the following general principles, enumerated in Herbert v.State, 357 So.2d 683 (Ala.Cr.App.), cert. denied, 357 So.2d 690
(Ala. 1978):
 "1. By statute, there is a presumption of sanity extending to all persons over the age of 14. *Page 922 
 "2. The defense of insanity is an affirmative defense. The burden of proving this defense rests upon the defendant and never shifts to the state.
 "3. The burden upon the defendant is to establish the issue of legal insanity by a preponderance of the evidence and to the reasonable satisfaction of the jury.
 "4. The question of insanity at the time of the commission of the crime is a matter to be determined by the jury from a consideration of all the evidence.
 "5. In making its determination, the jury may reject all expert testimony though it is without conflict.
 "6. However, opinion testimony, even of experts must be weighed by the jury and may not be arbitrarily ignored."
However, where proof of insanity is both overwhelming and uncontradicted, the evidence of insanity may be so strong and undisputed that the jury should be so instructed, and a jury verdict to the contrary must be reversed. Christian v. State,351 So.2d 623 (Ala. 1977).
The evidence pertaining to appellant's sanity in the instant case is both extensive and contradictory. Appellant's sanity was first brought into question by a pre-trial motion by appellant's counsel requesting an investigation of appellant's sanity pursuant to § 15-16-20, Code 1975. The trial court appointed Dr. Donald Crook and Dr. Bancroft Cooper to examine the appellant. Both were medical doctors of considerable experience, but neither specialized in psychiatry. Each doctor testified at trial that, in his opinion, appellant was not insane at the time of his examination of appellant on June 6, 1979. Dr. Crook stated that based upon the short time he spent with appellant, he believes appellant was sane at that time. He also testified that he had treated appellant several times over a period of years for various complaints, and that appellant had never exhibited any symptoms of schizophrenia. He stated he would, however, defer in his opinion of appellant's sanity to a psychiatrist who had spent a considerably greater period of time observing appellant.
Dr. Cooper stated that in his opinion appellant was not insane at the time of his examination of him on June 6, 1979. He further testified that, based upon his 20 minute interview with appellant, he could not make a decision as to whether appellant was a schizophrenic, paranoid type on the day the murder occurred.
Despite the two physicians' positive view of appellant's sanity, the trial court granted appellant's motion requesting that a three-member Lunacy Commission be appointed in accordance with § 15-16-22, Code 1975. Appellant was then committed to the custody of the Superintendent of Searcy Hospital for observation by the Lunacy Commission by order dated June 20, 1979. The report of the Lunacy Commission dated August 16, 1979, which was returned to the circuit court clerk, indicated a diagnosis of schizophrenia, paranoid type and that appellant was presently insane and incompetent. The report also stated it was the unanimous opinion of the Lunacy Commission that appellant was insane at the time of his admission to Searcy Hospital, and that appellant was probably insane and mentally incompetent at the time of the commission of the offense. (Emphasis added.) The trial court then issued an order dated August 22, 1979, ending the Lunacy Commission and retaining appellant in the custody of the superintendent of Searcy Hospital until such time as he was restored to mental competency. By letter dated April 7, 1980, the trial court was notified by Searcy Hospital that appellant was competent to stand trial, his mental illness having been placed in partial remission by medication. On April 11, 1980, the court ordered that custody of appellant be transferred to the Sheriff of Coffee County, and appellant was placed in the Houston County Jail. The report of the Lunacy Commission was introduced at trial and is present in the record. As well, the appellant introduced the deposition of Dr. William Rudder, after Dr. Rudder, for some reason, failed to respond to a subpoena to attend the trial. Dr. Rudder, a psychiatrist and member of the Lunacy Commission, testified appellant *Page 923 
suffered from the psychosis of paranoid type schizophrenia, but that it was in partial remission under medication. In his opinion, appellant did not know right from wrong on the date Sheriff Grantham was murdered, and was completely out of touch with reality. He stated appellant was not a borderline case and would be considered "crazy" any place in the world.
Because of the time lapse between the Lunacy Commission's diagnosis of appellant and the actual date set for trial the prosecution filed a motion on April 15, 1980, requesting that appellant be examined again to determine his mental competency. After a hearing on the motion, at which appellant was represented, the court granted the motion and ordered that the appellant be examined by Dr. Douglas McKeown, a licensed clinical psychologist. Dr. McKeown was called as a rebuttal witness for the State, over appellant's objection, and testified that he examined appellant at the Houston County Jail on April 23 and 27, 1981. He conducted a comprehensive psychological evaluation of appellant, including a psychological interview, over a period of 8 to 10 hours. In Dr. McKeown's opinion, appellant did know the difference between right and wrong on the date the Sheriff was shot. It was also his conclusion that appellant was suffering from paranoid schizophrenia. Dr. McKeown stated that he had never observed appellant when he was not under the medication prescribed for his mental problem.
After consideration of all the testimony in this case, we do not find that the evidence of insanity was both overwhelming and uncontradicted. There was evidence presented which could have supported a reasonable inference that the homicide was an act committed by a man which the law would define as sane. Although conflicting evidence was presented by the expert witnesses who examined appellant, it is clear that the issue of whether appellant was sane or insane at the time of the offense was a question for the jury to decide. Nobis v. State,401 So.2d 191 (Ala.Cr.App.), 401 So.2d 204 (Ala. 1981). The evidence was simply not sufficient as a matter of law to overcome the presumption of sanity and to justify reversing the jury's verdict. Graham v. State, 383 So.2d 892 (Ala.Cr.App.),cert. denied, 383 So.2d 895 (Ala. 1980).
 II
Appellant asserts the trial court abused its discretion in refusing to grant his motion for a change of venue, based upon prejudicial pre-trial publicity. The record indicates a large amount of coverage was given to the sensational and notorious crime by television, radio, and the printed news media. However, the vast majority of the news accounts were strictly factual in nature and did not editorialize in such a manner as to inflame the community. Coon v. State, 380 So.2d 980
(Ala.Cr.App. 1979), affirmed, 380 So.2d 990 (Ala. 1980). Additionally, much of the coverage occurred at the time of the murder, or in the months immediately following the event, with relatively little coverage occurring at the time of the trial over two years later.
The existence of widespread publicity in and of itself does not require a change of venue. Dolvin v. State, 391 So.2d 666
(Ala.Cr.App. 1979), affirmed, 391 So.2d 677 (Ala. 1980);Speigner v. State, 367 So.2d 590 (Ala.Cr.App.), cert. denied,367 So.2d 597 (Ala. 1979). Without proof of actual prejudicial influence upon the jury, a trial court will not be found to have abused its discretion in refusing to grant a motion for a change of venue based upon pre-trial publicity. Dolvin, supra. We have reviewed the record carefully, scrutinizing both the media coverage itself, and its effect upon the jury venire as revealed by the voir dire examination of the prospective jurors. We note that any potential prejudicial effect of media coverage was diminished by the passage of time. Speigner, supra. The record contains no showing of actual prejudice such as would have rendered it reasonably unlikely that the appellant could secure a fair and impartial trial. Dolvin, supra. The following quotation from the record is representative of questions asked of each member of the jury venire by the court and appellant's counsel: *Page 924 
 "THE COURT: We are going to now enter upon a detailed inquiry with you, and we are going to do it in such a fashion that we will call twelve individual jurors to come and have a seat in the jury box. After you are in the box I will ask you some questions and then the counsel for each will have the opportunity to ask the questions.
. . . .
 "Do any of you have any interest in the conviction of or the acquittal of the defendant Magwood? (No response.)
 "Have any of you made any promise given any person any assurance that if you were selected on the jury to try this case you will convict or you will acquit the defendant Magwood? (No positive response.)
. . . .
 "Do any of you have a fixed opinion at this time as to the guilt or innocence of defendant Magwood which would bias your verdict? (No positive response.)
 "Is there any juror on this group of twelve who has a reason that you would like to express why you could not serve as a juror in this case and render a true verdict based solely upon the evidence and the law applicable to the case? (No positive response.)
"Are any of you witnesses in this case? (None.)
 "Were any of you on the grand jury at the Special March Term, 1979, which returned this indictment, being on 12 March, 1979, with Bernice Winston, forewoman? (None.)
 "Do any of you as jurors think that a conviction should not be had on circumstantial evidence? (None.)
 "Do you as a juror have a fixed opinion against punishment by imprisonment in the penitentiary? (None.)
 "Ladies and gentlemen, a possible penalty, should the defendant be found guilty, is death by electrocution. Is there any juror who has an opinion against punishment by death by electrocution? Stated another way, are any of you opposed to capital punishment? (No juror responded affirmatively.)"
"QUESTIONS BY MR. CASSADY:
 "Q. Ladies and gentlemen of the jury did any of you know Neil Grantham? (Several of the twelve indicated they knew Sheriff Grantham.)
 "Q. Let me ask it this way, is there anybody that did not know him? (One lady indicated she didn't.)
 "Q. Were you a casual acquaintance or were you a close acquaintance, if that is a proper way to put it. (All answered casual.)
 "Q. I know you have all heard about this case or either read about it? (Several indicated affirmative.)
 "Q. Has what you have read or heard, has it in any way, in any way in your mind — there is nothing wrong in saying if it has — prejudiced your thinking about this case? (All negative response.)
 "Q. Nothing that you have read or heard would in any way affect you to any extent in your deliberations if you served on this jury? (Negative response.)
 "Q. Those of you who knew Neil Grantham I know would know one thing that he would expect whatever the circumstances that a defendant, whoever he was, or whatever he did to get a fair trial. I knew him, he was my friend, I know he would want that. Now, is there anyone of you sitting in this jury box, regardless of the circumstances, who would not give this defendant a fair trial in this case? It is important. It is important to the defendant, it is important to the State, it is important to you as human beings, and I am asking you if you will listen to this evidence that comes from this witness stand and that alone and make up your mind as to this man's innocence or guilt, and nothing but that, nothing else coming into your mind regardless. Can you all do that? (No response to the contrary.)
"MR. CASSADY: That's all I have." (R. 98-103)
Of the entire venire, one juror answered that he had a fixed opinion as to appellant's guilt or innocence. This juror *Page 925 
was an employee of the Coffee County Sheriff's Department which had been involved in the investigation of the Sheriff's assassination, and he was excused from serving. None of the questions of appellant's counsel concerning prejudice as a result of publicity were answered in the affirmative. Two jurors expressed an opinion of possible partiality, but stated it was based upon their long-time friendship with Sheriff Grantham, not pre-trial publicity. Both jurors were excused. The burden is upon appellant to demonstrate the actual existence of a prejudicial opinion in the mind of the jurors which will raise a presumption of partiality. Speigner, supra. The introduction of news articles alone, without more, is not sufficient evidence to justify a change of venue; their prejudicial effect must be shown. Dolvin, supra at 674; Dial v.State, 387 So.2d 871 (Ala.Cr.App. 1979), reversed on othergrounds, 387 So.2d 879 (Ala. 1980).
The appellant in the instant case presented no evidence that the jurors were actually prejudiced against the appellant's case as a result of extensive publicity. Without such proof, this court could not find error in the trial court's refusal to grant a motion for change of venue. Dolvin, supra; Moberg v.State, 385 So.2d 74 (Ala.Cr.App. 1980); Coon, supra.
 III
Appellant argues that both the trial court and the jury failed to properly weigh mitigating circumstances. We have examined the record and find that the trial court duly and properly charged the jury concerning mitigating circumstances. The trial judge's written finding of fact also indicates he considered and weighed any possible mitigating circumstances in appellant's favor. We find no error in that regard.
 IV
The trial court's failure to grant appellant's request for funds to hire a psychiatrist or psychologist of his own choosing is urged by appellant as reversible error. We do not agree. As has often been stated, a denial of funds to pay experts for investigations and the assistance of experts does not amount to a deprivation of constitutional rights. Thigpenv. State, 372 So.2d 385 (Ala.Cr.App.), cert. denied,372 So.2d 387 (Ala. 1979); Brown v. State, 392 So.2d 1248 (Ala.Cr.App. 1980), cert. denied, 392 So.2d 1266 (Ala. 1981); Johnson v.State, 335 So.2d 663 (Ala.Cr.App.), cert. denied, 335 So.2d 678
(Ala. 1976), cert. denied, 429 U.S. 1026, 97 S.Ct. 649,50 L.Ed.2d 629 (1976). This general rule applies equally to psychiatric experts and specialists. Nelson v. State,405 So.2d 392 (Ala.Cr.App. 1980), reversed on other grounds,405 So.2d 401 (Ala. 1981). Additionally, as indicated heretofore in this opinion, the trial court exhausted all available sources to assist appellant in presenting evidence in support of his insanity plea. Not one, but six experts examined appellant at the State's expense. Clark v. State, 56 Ala. App. 67,318 So.2d 813 (1974), writ quashed, 294 Ala. 493, 318 So.2d 822 (1975),cert. denied, 423 U.S. 937, 96 S.Ct. 298, 46 L.Ed.2d 270
(1975). Three experts were independent, and three were State connected. Although a defendant may have some right to the appointment of an expert for preparation of his defense, there exists no constitutional right to have a private psychiatrist of the defendant's own choosing appointed at public expense. (Emphasis added.) Willie Clisby, Jr. v. State, (Ala.Cr.App. 1982), 6 Div. 576 [Ms. May 2, 1982]. The trial judge's actions appropriately protected appellant's rights in this regard.
 V
Appellant alleges the trial court erred in admitting the testimony of Doctors Crook, Cooper, and McKeown, because appellant was not advised of the right to remain silent before the interview, and because appellant's counsel was either not present at, or not informed of, the time of the interviews. Appellant contends the introduction of this expert testimony violated the privilege against self-incrimination and the right to effective assistance of counsel guaranteed under the Fifth and Sixth Amendments *Page 926 
to the United States Constitution. He cites Estelle v. State,451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), as dispositive of this issue.
The Supreme Court held in Estelle that the use of certain psychiatric testimony at the sentencing phase of defendant's capital murder trial to establish his future dangerousness violated his Fifth Amendment rights. The court determined that where a defendant never initiated a psychiatric exam, nor ever attempted to introduce psychiatric evidence, he could not be compelled to respond to a psychiatric examination instigated sua sponte by the trial court if the statements could be used against him at trial. Hence, it was necessary in such a situation that appellant be advised of his right to remain silent and of the fact his answer could be used against him before such examination could take place. The failure to so advise the appellant rendered the psychiatrist's testimony, as to the substance of disclosures made to appellant, inadmissible at trial. The court found there would have been no Fifth Amendment violation if the psychiatrist's testimony had been limited to the question of the defendant's competency to stand trial. The court also was careful to distinguish Estelle from a fact situation involving a psychological interview occasioned by a defendant's plea of not guilty by reason of insanity at the time of the offense. To allow a defendant to remain silent, when he asserts the offense of insanity and introduces supporting psychiatric testimony, might deprive the State of its only effective measure of controverting the defendant's proof on an issue interjected into the trial by the defendant himself. Estelle, supra, and cases cited therein.
As well, the court found that the defendant's Sixth Amendment right to effective assistance of counsel was violated because the defendant's counsel was not informed in advance that the psychiatric examination would encompass the issue of future dangerousness. The defendant was thus denied the valuable assistance of his counsel in deciding whether to consent to the examination.
We find in our review of the instant case that Estelle is factually distinguishable and hence does not require reversal here. Unlike the defendant in Estelle, appellant's counsel herein first placed appellant's sanity in question by filing a motion which requested that an investigation be held into appellant's sanity, and that, upon a finding of incompetence, appellant be removed to a State hospital for the insane. Dr. Crook and Dr. Cooper were appointed in compliance with the trial court's order granting appellant's motion. Not only were appellant's counsel aware that the two doctors examined appellant, but they were the parties that requested such an examination. Additionally, the testimony of the two doctors was substantially confined by the prosecution to the question of appellant's mental competency at the time of the examination, and not at the time of the crime. Additionally, we point out that all the expert testimony objected to here came in as rebuttal testimony, after the defense rested, having presented a defense of not guilty by reason of insanity. As to Dr. McKeown, a hearing was had on the State's motion requesting a further examination of appellant's mental status after his release from Searcy Hospital. Appellant and his counsel were present at the hearing on the motion and were informed of the pending examination by Dr. McKeown. Appellant's counsel agreed to the examination, conditioned upon his receiving a copy of the report. Appellant's counsel stated for the record that the court order granting the State's motion would be in line with the motion for a mental examination appellant had previously requested. Again, Dr. McKeown's testimony was only brought in by the State on rebuttal after appellant's insanity defense was presented.
In review, we find appellant's counsel initiated the inquiry into appellant's sanity, resulting in the examination by Doctors Crook and Cooper. Appellant's counsel acquiesced in the examination by Dr. McKeown, albeit at the State's request, and stated such an examination was in partial *Page 927 
compliance with his own motion. At arraignment, appellant pled not guilty by reason of insanity, and at trial presented an insanity defense. The testimony of the three experts came in only on rebuttal, after appellant presented an insanity defense. Their testimony dealt with their diagnosis of appellant's mental competency at various points in time and did not deal with the substance of any incriminating information revealed to them by appellant during their examination. Appellant's counsel were informed of each examination and had every opportunity to counsel with their client. Appellant and his counsel informed Dr. McKeown that the examination would be reported to the court, and there could therefore be no expectation of confidentiality. We hold that by actively pursuing an insanity defense and introducing the deposition of Dr. Rudder as a defense witness, appellant waived any potential psychotherapist-patient privilege or privilege against self-incrimination against the subsequent testimony of Dr. McKeown on rebuttal.
 "As the Court of Criminal Appeals notes in its opinion, there are states which hold that by pleading insanity, a criminal defendant waives his statutory privilege against disclosure of a `psychotherapist-patient communication.' The better reasoned cases hold, however, that there must be some presentation of evidence of insanity in addition to the plea, in order for the question of `waiver' to arise. . . ." Ex parte Day, 378 So.2d 1159 (Ala. 1979), at p. 1162.
To hold otherwise would be to allow appellant to call all those psychotherapists or psychiatrists, who examined appellant under State order, he desired. Then, on a claim of privilege, appellant would be able to prevent the State from calling experts who examined him for the same purpose on rebuttal to refute the appellant's defense. Ex parte Day, supra; Estelle, supra, and cases cited therein.
 VI
Appellant asserts that the trial court's failure to issue a bench warrant to require Dr. Rudder to appear and testify was reversible error. Appellant introduced Dr. Rudder's deposition at trial, after his failure to appear and the trial court's refusal to command his appearance. Dr. Rudder is on the staff of Searcy State Hospital. Section 22-50-22, Code 1975, provides that any physician of a State mental hospital may not be compelled to attend as a witness to present expert testimony in any case or any question of sanity if he certifies in writing within 10 days after receipt of a summons that his absence from the hospital would interfere with his professional duties and the welfare of his patients. A defendant who desires the testimony of the doctors may, however, depose them on all matters involving their expert opinion. This furnishes to the defendant a constitutional alternative to compulsory attendance. Seay v. State, 390 So.2d 11 (Ala. 1980), cert.denied, 449 U.S. 1134, 101 S.Ct. 956, 67 L.Ed.2d 121 (1980). Appellant's counsel at trial had not ascertained if Dr. Rudder had been served with the subpoena at the time he was called to testify. The trial judge contacted the local county courthouse to verify service, but was unable to receive any information because the offices were closed for a legal holiday. No certificate from Dr. Rudder of his inability to attend the trial appears in the record. Quite clearly, Dr. Rudder could not have been compelled to attend had such a certification been provided. Appellant had taken the precautionary step of deposing Dr. Rudder in advance. This deposition was in fact offered and received into evidence. Appellant's counsel did not personally verify service on his witness. He was permitted by the court to introduce Dr. Rudder's deposition, in lieu of his testimony. The trial court used every available avenue to determine if Dr. Rudder had been served, after it became apparent that appellant had failed to do so. If Dr. Rudder had been served, he could have easily refused to attend under the statute. The subpoena for Dr. Rudder was issued May 26, and the trial was on June 1 and 2. The 10 days allowed by statute for Dr. Rudder's certified response to the subpoena had not expired at the time *Page 928 
appellant called Dr. Rudder to testify. We find no error or prejudice to the appellant in the trial court's refusal to issue the bench warrant under these circumstances. Pollard v.State, 358 So.2d 778 (Ala.Cr.App.), cert. denied, 358 So.2d 782
(Ala. 1978).
 VII
Appellant argues the statute under which he was indicted is unconstitutional. This question has been resolved by the Alabama Supreme Court in Beck v. State, 396 So.2d 645 (Ala. 1981), and by our recent decision in Clisby, supra.
The Supreme Court of Alabama in Beck, supra, has indicated the standards and procedures it requires this court to follow in reviewing capital murder cases. We have closely scrutinized this case in light of those standards, and find that the crime was properly punishable by death, and that the sentence was appropriate in both its relation to the crime and to the appellant. There were no accomplices with which to compare appellant's punishment. We have searched the record for error prejudicial to the substantial rights of appellant and have found none. This case is, therefore, affirmed.
AFFIRMED.
All the Judges concur.
[1] The trial court's determination of sentence, dated June 30, 1981, is hereto attached as Appendix A (Vol. 2, R. 370-372).
 APPENDIX A
STATE OF ALABAMA, ) IN THE CIRCUIT COURT OF Plaintiff ) ) COFFEE COUNTY, ALABAMA vs. ) ) ELBA DIVISION BILLY JOE MAGWOOD, ) Defendant ) CASE NO. CC 79-7
On June 2, 1981, Billy Joe Magwood was found guilty of the capital felony set forth in Section 13-11-2 (a)(5), Code 1975, and for the aggravated murder of Coffee County Sheriff Neil Grantham, the jury fixed the punishment at death. A hearing mandated by Sections 13-11-3 and 13-11-4, Code 1975, was held June 9, 1981, and the issue of sentence was submitted.
The court is convinced the jury took into account the circumstances of the murder together with the character and propensity of Magwood under all relevant evidence. The court concludes there was no arbitrary and capricious exercise of the power of the jury in finding guilt and fixing the punishment at death.
Magwood beyond any doubt committed the charged aggravated murder. The "aggravation" found to exist beyond all doubt is that Magwood unlawfully, intentionally, and with malice aforethought killed Coffee County Sheriff Neil Grantham by shooting him three times at close range with a pistol while Grantham was on duty and because of official job related acts as Sheriff of Coffee County, Alabama. The court does not find the existence of an aggravating circumstance in Section 13-11-6, Code 1975, other than the "aggravation" alleged in the indictment. Beck v. State, Ala., 396 So.2d 645 (1981); Kyser v.State, Ala., (1981). The court is required to focus on the particularized nature of the crime. The crime is particularized by the aggravation.
The matters relating to any mitigating circumstances including those enumerated in Section 13-11-7, Code 1975, have been considered. The court concludes that Magwood has no known significant prior criminal activity other than a conviction for possession of a controlled substance and his age at the time of the murder of Sheriff Grantham was twenty-seven years. These mitigating circumstances exist. The jury in the guilt phase of the trial rejected the not guilty by reason of insanity plea. The court concludes Magwood did not kill Grantham under influence of extreme or emotional disturbance and when the three bullets were fired into the body of Grantham, Magwood had the capacity to appreciate the criminality of his act. Magwood's conduct was contrived, calculated and previously designed with the capacity to conform his conduct to the requirements of the law.
The court has considered the relevant facets of the character and record of Billy Joe Magwood and the circumstances of the particular offense. Magwood has been considered as a uniquely individual human being *Page 929 
and not a faceless undifferentiated person who stands convicted of a designated capital offense. The court has considered the factors of why a death sentence should be imposed and why it should not be imposed. The circumstances of aggravation and mitigation have been weighed against each other.
IT IS, THEREFORE, ORDERED AND ADJUDGED BY THE COURT AS FOLLOWS:
1. That the verdicts of the jury finding Billy Joe Magwood guilty of the capital felony and fixing the punishment at death for the murder of Coffee County Sheriff Neil Grantham are sustained by the evidence beyond a reasonable doubt.
2. That the fixing of the punishment at death by the jury was not the result of passion, prejudice or other arbitrary factor while deliberating and fixing the sentence.
3. That Billy Joe Magwood is adjudged guilty of the capital offense of the murder of Coffee County Sheriff Neil Grantham.
4. That does Billy Joe Magwood have anything to say before sentence or anything to say why the sentence of the law should not be imposed in accordance with law.
5. That the age of Magwood and no known significant prior criminal activity by him are insufficient to outweigh the unlawful, intentional and malicious killing of Coffee County Sheriff Neil Grantham by shooting him with a pistol while Grantham was on duty and because of official job related acts as Sheriff of Coffee County, Alabama.
6. That it is the judgment and sentence of the court that you, Billy Joe Magwood, for the offense of aggravated murder, be sentenced to death by electrocution on August 4, 1981, by the executioner causing to pass through the body of Billy Joe Magwood a current of electricity of such intensity to cause death, and the application and continuance of such current through your body, Billy Joe Magwood, until you are dead.
7. That execution of the sentence of death is stayed pending automatic review provided by Section 13-11-5, Code 1975, and Section 12-22-150, Code 1975.
DONE AND ORDERED this 30th day of June, 1981.
 /s/ Riley Green
CIRCUIT JUDGE