Herbert Spencer Salmon, III was indicted for the intentional murder of one Herbert Spencer Salmon, IV, his 30 day old child, by "beating or shaking or striking or squeezing him with his hands", in violation of § 13A-6-2, Code of Alabama 1975. The appellant entered a plea of not guilty and not guilty by reason of mental defect or disease. The jury found the appellant "guilty of murder as charged" and, following a sentencing hearing, the trial judge sentenced him to life imprisonment.
Ernestine Salmon testified that she was married to the appellant. She said that on April 9, 1983, they lived at Cedarbrook South Apartments. She said they had two sons who lived with them in the apartment. She stated that their youngest son, Herbert Spencer Salmon, IV, was 30 days old on April 9, 1983.
Mrs. Salmon testified that on April 9, 1983, she left the apartment at approximately 3:45 p.m. to run some errands. When she returned at 5:15 p.m. her husband was watching television. She went to the bedroom and glanced at the baby, who appeared to be asleep. The child's mouth was open and he looked a little paler than normal, but as she was in a hurry to get supper started, she did not check him very closely. She prepared the baby's bottle and went to feed him. When she picked him up, his body was cold and he would not move. She noticed two small marks on his cheeks. She screamed for the appellant, telling him something was wrong with the *Page 335 
baby. She carried the baby to the dining room and placed him on the table where she and the appellant began mouth-to-mouth resuscitation. They could not revive the child so the appellant called the paramedics. Mrs. Salmon stated that during this time the appellant's face was drained of color and he looked real funny. The paramedics arrived and began mouth-to-mouth resuscitation, but they could not revive the child. They called Brookwood Hospital for an ambulance which arrived shortly thereafter, along with Hoover police officers. The child was transported to Brookwood Hospital where he was pronounced dead. The Hoover police transported Mrs. Salmon and the appellant back to their apartment.
Mrs. Salmon testified that she stayed with her parents that night but her husband remained in the apartment. She received a telephone call the next morning from Sergeant Murdock. She stated that together with her sister and her parents she went to her apartment as a result of this call. When they entered the apartment they saw a note addressed to her, taped to the back of a dining room chair. She said that her father handed the note to her. She further stated that the note was not signed, but was in the appellant's handwriting. She said that Sergeant Linda Kirchler, of the Hoover Police Department, came to the apartment and she gave the note to Sergeant Kirchler. In part, the note stated, "I promise you, I had no intention of taking Herbert's life, but unfortunately, I was too rough on him and Herbert didn't make it. . . . I'm turning myself in to the authorities." (R. 59).
Mrs. Salmon testified that for several months prior to the baby's death, the appellant would come home from work early. He was Vice-President of his family company. She said he would come home at one or two o'clock in the afternoon, then just sit and watch television and play complicated games by himself. She stated that she could not communicate with the appellant at all. He could not stand stress or pressure and began withdrawing. She stated that for several years she had felt that he needed "help", but that he was not insane. She said that he had displayed a temper in the past, but that he had never hurt her or the children.
James Phillips testified that he was employed as a paramedic for the City of Hoover Fire Department. On April 9, 1983, Phillips and his partner were called to the Salmon's residence at Cedarbrook Apartments. When they entered the apartment Mrs. Salmon was working on, and trying to revive, an infant which was lying on the dining room table. Phillips checked the baby, but found no respiration or pulse. He said that he began cardiopulmonary resuscitation. He could not revive the child, so an ambulance was called and the baby was transported to Brookwood Hospital where he was turned over to a resuscitation team.
D.C. Scivley testified that he was employed as a police officer by the City of Hoover. He said that on April 9, 1983, he responded to a call at the Salmon residence. He stated that when the child was taken to the hospital, the key to the apartment was given to Sergeant Reeves. After the baby was pronounced dead, he transported the Salmons by City Hall where they picked up the keys to their apartment. He then transported them to their apartment. He stated that he never observed the appellant engage in any irrational behavior.
Harold Murdock testified that he was employed as a Detective-Sergeant by the City of Hoover Police Department. He was called to the police station on the morning of April 10, 1983, and told by Sergeant Franklin that the appellant wanted to talk to him about the death of his child. The appellant had come to the police station of his own free will. He indicated that the appellant was calm and exhibited no irrational behavior.
The appellant was read his Miranda warnings and signed a waiver of rights form. At this time the appellant gave a statement to him and Officer Kirchler. This statement was recorded. The appellant also gave a statement in his own handwriting. *Page 336 
The appellant was then arrested and charged with murder.
Robert E. Jones, Jr., testified that he was a physician. On April 9, 1983, he performed an autopsy on Herbert Spencer Salmon, IV. From his external examination of the child, two small cuts or scrapes were revealed about one-half inch on each side. The left ear was bruised, as was the area on the back of the scalp. He stated that there were small bruises on each arm.
Dr. Jones testified that the internal examination revealed hemorrhage deep into the skin of the scalp. The skull had small fractures on each side, approximately an inch or one and one-half inches long. These fractures were consistent with someone grabbing the head with the hands and squeezing. There was trauma to both sides of the head. He stated it was his opinion that death resulted from trauma or injury to the head.
Allen E. Shealy, a clinical psychologist, testified that he examined the appellant on two occasions. These examinations lasted approximately two hours each and consisted of psychological testing and interviewing the appellant. He stated that he first examined the appellant on May 5, 1983, then again on May 10, 1983. He stated that the appellant told him he came to see him because appellant had been charged with the accidental death of his one month old son.
Dr. Shealy stated that he asked the appellant to describe the death of his son. The appellant told him the following:
 "My one month child let out a cry which provoked the irrational behavior. I do recognize the child as my son, so there was a partial level of consciousness at that time. By the time I was shaking him, I didn't know what his name was and I didn't even know that he was a baby. The baby was held in a parallel plane over the bed and not taken away from the bed. At that time, I thought of it as a form, not a child. The second act was the squeezing of the head. The autopsy said a cerebral hemorrhage. The baby's eyes were open and it was breathing and looked quite exhausted. Its pulse was slow. It was looking outward, not necessarily at me." (R. 206-207).
He stated that it was his opinion that the appellant was of above average intelligence based on the appellant's vocabulary and general knowledge. He further stated that the appellant showed no emotion during the time he interviewed him.
Dr. Shealy testified that he administered several psychological tests to the appellant and that these tests showed this appellant was a paranoid schizophrenic. He stated that it was his opinion that on April 9, 1983, at the time the appellant committed this act, the appellant was suffering from the disease of paranoid schizophrenia. In his opinion, the appellant lacked the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.
Dr. Shealy further testified that, when the appellant came to his office for the first interview, he could understand him well. He stated that appellant had no speech defects and was organized in his speech. He also said that the appellant conveyed to the doctor his belief that he was suffering from a mental disorder.
Patrick Linton testified that he was a psychiatrist employed by the University of Alabama in Birmingham. On May 24, 1983, the appellant was transferred from Brookwood Hospital to the University Medical Center. He stated that he saw the appellant every day, with a few exceptions, during appellant's two and one-half month stay in this hospital. His diagnosis of the appellant was schizophrenic disorder, paranoid type. He stated that the appellant was withdrawn, quiet, showed little emotion, and was very circumstantial and involved with explanations. He said that the appellant recalled "either having squeezed the child's head or done some kind of damage."
Dr. Linton testified in his opinion the appellant's act was a result of his illness. His opinion was that the appellant lacked *Page 337 
the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. However, Dr. Linton stated that the writer of the note indicated appreciation of criminality of conduct. He stated that the act of a person going to the authorities and turning himself in would denote that the person had substantial capacity to appreciate the criminality of his conduct. He further agreed that the statement in the note, "And unfortunately, in anger, I shook the child and also squeezed his head, out of anger, but there's no excuse for that, though, and I just wanted to be honest with the authorities and clear the air, and I realize I have a debt to pay to society", was written by someone who appreciates the criminality of his conduct. Dr. Linton further said that if a person performs some bizarre act on one day, and appears rational the next, generally, he will recall the facts that occurred the day before.
Larry Beverly testified that Ernestine Salmon is his sister and the appellant is his brother-in-law. He is the office manager at Salmon and Company. He stated that the appellant had been leaving work early every day because of a lack of business activity. He stated that he was in the appellant's presence every day from May of 1980 until April of 1983. He stated that he never observed the appellant act irrationally. He stated that he and the appellant made joint decisions at work and that appellant did not appear to be unduly stressed by his decision making position. He further stated that he was with the appellant on the day before the death of appellant's son and appellant was normal on that occasion.
 I
There was no evidence that the appellant had a history of mental defect or disease. After a careful review of the testimony in this case, it is clear that there was sufficient evidence presented to go to the jury on the issue of appellant's insanity vel non. See Wherry v. State,402 So.2d 1130 (Ala.Crim.App. 1981); Shorts v. State, 412 So.2d 830
(Ala.Crim.App. 1981); Thomas v. State, 418 So.2d 199
(Ala.Crim.App. 1982); Nobis v. State, 401 So.2d 191
(Ala.Crim.App.), cert. denied, 401 So.2d 204 (Ala. 1981).
 II
The appellant contends that the trial court committed reversible error in admitting into evidence appellant's medical records from Hillcrest Hospital. He argues that the introduction of these records constituted a violation of his psychotherapist/psychiatrist-patient privilege.
In a review of the evidence presented in this cause, we find that the appellant initiated the inquiry into his sanity. At arraignment, appellant pled not guilty by reason of mental defect or disease, and at trial presented an insanity defense. The records complained of, which are accounts of Dr. Grayson's analysis of the appellant, came in on rebuttal, after the appellant presented an insanity defense. These records contained information relevant to Dr. Grayson's diagnosis and observation of the appellant. The appellant offered the testimony of Dr. Shealy, a psychologist, and Dr. Linton, a psychiatrist, as defense witnesses in his cause. They testified to the effect that, in their opinion, the appellant was not legally responsible for this action by virtue of a mental defect and disease.
We hold that by actively pursuing an insanity defense and introducing testimony of qualified psychologists or psychiatrists as defense witnesses, the appellant has waived any potential psychotherapist-patient privilege or privilege against self-incrimination against subsequent qualified testimony or rebuttal. The Supreme Court of Alabama in an opinion authored by Mr. Justice Bloodworth in Ex Parte Day,378 So.2d 1159 (Ala. 1979), stated:
 "As the Court of Criminal Appeals notes in its opinion, there are states which hold that by pleading insanity, a criminal defendant waives his statutory privilege against disclosure of a `psychotherapist-patient communication.' The better *Page 338 
reasoned cases hold, however, that there must be some presentation of evidence of insanity in addition to the plea, in order for the question of `waiver' to arise. . . ."
As this court stated in Magwood v. State, 426 So.2d 918
(Ala.Crim.App. 1982), affirmed, 426 So.2d 929 (Ala. 1983), "to allow a defendant to remain silent, when he asserts the offense of insanity and introduces supporting psychiatric testimony, might deprive the State of its only effective measure of controverting the defendant's proof on an issue interjected into the trial by the defendant himself."
As noted above, these records were introduced in lieu of the testimony of Dr. Grayson himself, and only on rebuttal after the appellant had put on testimony supporting his plea of not guilty by reason of mental defect or disease. This evidence was properly admitted by the trial court.
Moreover, the essence of these records were revealed during the trial of this cause. The information relative to Dr. Grayson's analysis of the appellant was presented by reference to the records during the testimony of defense witnesses, Dr. Shealy and Dr. Linton, without objection by the defense on the basis of psychiatrist-patient privilege. (R. 281-295, 411-412). Since such evidence was already before the jury, it was not error to admit these records.
 III
The appellant contends that the trial court erred to reversal in charging the jury, as a means to determine intent, that "the law says one is presumed to intend the natural and probable and inevitable consequence of his own intentional acts." He also argues that the court compounded this error by repeating the same charge over defense counsel's timely objection.
The United States Supreme Court determined in Sandstrom v.Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), that the trial court erred to reversal in charging the jury that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts." Id. at 513,99 S.Ct. at 2453. The appellant contends that the instruction on intent at his trial was sufficiently similar to the instruction inSandstrom to warrant reversal.
According to Sandstrom, the threshold inquiry which must be made is "to determine the nature of the presumption [the jury instruction] describes. Id. at 514, 99 S.Ct. at 2454; Franklinv. Francis, 720 F.2d 1206, 1209 (11th Cir. 1983). One must pay "careful attention to the words actually spoken to the jury, for whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction." Id. In the Sandstrom case, the Court stated that "a reasonable juror could well have interpreted the presumption as `conclusive', that is, not technically as a presumption at all, but rather as an irrebuttable direction by the court to find intent once convinced of the facts triggering the presumption." Id.442 U.S. at 517, 99 S.Ct. at 2456. The Court further stated that such a presumption could have been viewed as a mandatory rebuttal presumption. The Court further stated that because some of the jurors "could have given the presumption conclusive or persuasion-shifting effect . . . we cannot discount the possibility that [the] jurors actually did proceed upon one or the other of these interpretations." Id. at 520, 99 S.Ct. 2457.
In the present case, the trial judge initially instructed the jury as follows: (R. 566).
 "The law says that one is presumed to intend the natural and probable and inevitable consequences of his own intentional acts. That is, if someone intentionally — and you look to all the surrounding facts and circumstances. If one intentionally does an act, intentionally does that act, the only natural, probable and inevitable consequence of which would result in someone's death, then the law says that person intends not only the act, but the result. There have been examples given. An extreme example, if I throw this gavel at that window, I am said to have intended to cause the window to be broken because that is the *Page 339 
natural, inevitable and probable consequence of my intentional act.
 "So if you believe beyond a reasonable doubt that this defendant, Herbert Spencer Salmon, III, with the intention to cause the death of Herbert Spencer Salmon, IV, intentionally — and it is alleged in the indictment — intentionally did acts which caused that death — that is, knowingly, willfully, intentionally did acts which the natural, probable and inevitable consequence of which would be to cause the death — if you believe that beyond a reasonable doubt, then you must find the Defendant guilty of murder.
After the court gave instructions on lesser included offenses, he gave the following charge: (R. 569).
 "Let me go over that again. Murder, intention to take the life of someone. You intend to take the life of someone and you intentionally do acts which take that life. That's murder. And as I said, one is presumed to have intended the result of the natural, probable and inevitable consequence of their own intentional acts. And with that in mind, a specific intent to kill and intentionally do acts which cause that death, that's murder."
The trial judge further instructed the jury, during a supplemental charge, as follows: (R. 588).
 "In order to convict someone of murder, you must believe beyond a reasonable doubt from the evidence that the Defendant, with the intention to take one's life, or the life of Herbert Spencer Salmon, IV, with the intention to take that life, intentionally does an act or acts which result in death. It is an intention to kill. As I said before, one is presumed to intend the natural, probable and inevitable results of his own intentional acts. So murder is intentionally killing someone; that is, with the intention to kill someone, you intentionally do an act and that person dies.
 "In order to convict Herbert Spencer Salmon, III of murder, you must believe beyond a reasonable doubt that with the intent to take the life of Herbert Spencer Salmon, IV, he intentionally did acts which caused that death. An intent to kill. As I said, intent may be inferred from — the natural, inevitable results of their own intentional act, one is said to have intended the result. That's for the jury to determine. That's murder. But the key word is intentional."
The court in Sandstrom found that such a charge could have been interpreted as shifting the burden of proof to thedefendant to prove that he lacked the requisite mental intent. In the case at bar, we have a conclusive presumption as described in Sandstrom.
Before making a final determination that such a charge as given here, and in the Sandstrom case is constitutionally defective, we must determine whether the alleged burden shift affected an essential element of the offense. The statute under which the appellant was charged, § 13A-6-2, Code of Alabama 1975, defines murder as follows:
 "A person commits the crime of murder if [w]ith the intent to cause the death of another person, he causes the death of that person or of another person; . . ."
The cases are legion in Alabama which state that intent is an essential element of the crime of murder. See Swann v. State,412 So.2d 1253 (Ala.Crim.App. 1982); Sanders v. State,392 So.2d 1280 (Ala.Crim.App. 1980). Thus, the intent instruction in this case clearly relates to an essential element of the offense charged.
"The Supreme Court's final step in Sandstrom was to determine whether either of the two possible interpretations of the intent presumption (that it was a conclusive presumption or a mandatory rebuttable presumption requiring the defendant to present evidence to the contrary) was constitutional." Franklinv. Francis, 720 F.2d 1206, 1210 (11th Cir. 1983). The Supreme Court in Sandstrom, in determining the validity of a conclusive presumption, stated that such a presumption would "conflict with the overriding presumption of innocence with which the law endows the *Page 340 
accused and which extends to every element of the crime," and would "invade [the] factfinding function which in a criminal case the law assigns solely to the jury." Sandstrom,442 U.S. at 524, 99 S.Ct. at 2459. Under the interpretation given such a conclusive presumption by the Sandstrom case, the presumption in this case is necessarily unconstitutional.
The Supreme Court left the question of whether such a charge would be harmless error open in Sandstrom. However, subsequent opinions indicate that the Court feels such a "presumption that the defendant intended to kill completely eliminates the defense of `no intent'". See Connecticut v. Johnson,460 U.S. 73, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983). The rule in the Eleventh Circuit appears to be that such a presumption may be considered harmless if intent has been overwhelmingly proved by the evidence in the case or if the instruction "shifted the burden of proof to the defendant with respect to an element of the crime not at issue in the case." Drake v. Francis,727 F.2d 990, 999 (11th Cir. 1984).
In the case at bar, we are not prepared to hold that such evidence of intent was so overwhelming that this improper instruction could not have been considered by or contributed to the jury's decision to find the appellant guilty of murder.
As required by Cupp v. Naughten, 414 U.S. 141, 94 S.Ct. 396,38 L.Ed.2d 368 (1973) and Lowman v. State, 400 So.2d 430
(Ala.Crim.App.), cert. denied, 400 So.2d 434 (Ala. 1981), we have considered the offensive jury instruction in the context of the overall charge. Although the trial court couched its supplemental charge in terms of an inference, we cannot hold that this cured the overall effect of the charge on intent. Therefore, the charge must be viewed as reversible error in this cause.
Moreover, in Sandstrom, the Supreme Court cited an Alabama case which is also dispositive of the issue at hand, Hall v.State, 49 Ala. App. 381, 272 So.2d 590 (1973). In Hall, the objectionable language used by the trial court in its charge to the jury was that the law presumes one intends to do that which he does. The court held under such an instruction the "jury may mistakenly believe that it is permissible to infer specific knowledge or intent solely from the doing of a particular act, without regard to the totality of the circumstances; or that the occurrence of particular acts shifts the burden of proof to the defendant; or that the question is whether a reasonable man in similar circumstances would have had the requisite knowledge or intent, rather than whether the accused actually had it."Hall, 49 Ala. App. at 384, 272 So.2d at 593., The decision inHall was followed by Carter v. State, 53 Ala. App. 43,297 So.2d 175 (1974). In Carter the objectionable language which the court found impermissible was that the law presumes one to intend the natural and probable consequences of his act. In ruling on this instruction, this court stated that "such an instruction to the jury makes the subjective intent of the defendant the determining factor whether a crime has been committed at all." Carter, 53 Ala. App. at 48, 297 So.2d at 180.
Under the authorities cited above, and the discussion above stated, we hold the jury instructions in this case were erroneous and this cause must therefore be reversed and remanded.
The remaining issues submitted for review by the appellant have been pretermitted.
In view of our holding, this cause is reversed and remanded for a new trial.
REVERSED AND REMANDED.
All the Judges concur. *Page 341